The opinion of the Court was delivered by
RichaRPSOn, J.
It is a plain misconstruction of the Act of 1817, as well as of the Acts upon the same subject preceding it, to suppose, that to trade with a slave for his own property is not within the penalty of those Acts. The evident'object of it is to prevent any trading whatever with a slave. Eor this purpose, at least, a slave can have no property; and it is believed, that the Act of 1817,[1] will embrace every instance of selling to, buying from, or bartering with, a slave having no license. If frivolous charges should be made, they must be left to the cautious discretion of the prosecuting officer, the good sense of a grand jury, or finally to the governor ; neither of whom, it may be safely concluded, will suffer a merely malicious charge, destitute of merit, to succeed. But the Act in itself,[2] from its fullest expression, the necessity arising out of our local situation, and the consequent obvious policy, is comprehensive, universal, and stern..
As to the other view which may be taken of this ground that the overseer delivered the eoru to the slave, and stood by, not forbidding the trading; it has been long since decided,[3] that the employer’s delivery *of any article to a slave, and afterwards standing by for the pur-*30] pose of detecting an offender, who may trade with the slave, does not legalize the trading. On the contrary, this means of detecting persons who notoriously trade with slaves, is becoming common ; and being prudently practiced, may be rendered very efficacious. It is true, that where the owner or employer stands by, apparently sanctioning the transaction, it is a fair inference that the trading is with him, and not with the slave; as frequently happens, when a carriage stops at a store, and a servant is sent in for some article. But when the owner goes in order to detect, and for that purpose merely eyes the traffic carried^on, giving to the offender no real or apparent intimation of his assent, it has been often decided, that the inference is rebutted by the truth ; and that the policy of the law sanctions a practice so essential to the exposure of skilful traders.
■ As to the request made, that the Court would look into the authority of Mr. Ellison,[4] for holding the Court under a temporary commission,[5]1 will briefly observe, that no such objection having been made at the trial, there is nothing regularly before this Appeal Court, upon that subject. Such a motion, therefore, comes too late, as was also decided in the case of -. Any other decision might destroy the judgment, and other proceedings of entire terms, holden under such commissions. We cannot, then, strain liberality in order to indulge a request fraught with so much evil.
We come now to the only question properly arising out of the facts in the case, to wit: Was Polydore instructed.by the defendant to deal with slaves without permits or tickets ?[6]
This was a matter of inference from the evidence given; and involves the inquiry, perhaps, whether the judge, in no way misled the jury upon points made in his charge. The law so well decided, both in this State *387 [*31 and abroad, that a master is not liable for the acts of his servants, unless done by authority; *and that the principal is not liable for the criminal acts of his mere civil agents, we fully recognize. See Middleton v. Fowler, 1 Salk. 282. M'Manus v. Cricket, 1 East. 106. 2 Roll. Abr. 553. These positions are indeed well settled, in 2 Bay, 345, 360, Snee v. Trice, State v. Dawson. But in the case before us, the sole inquiry is, was Polydore instructed ? The jury have affirmed' that he was instructed to do the criminal act. But it is denied, that their verdict is supported by the evidence. To determine the truth we must turn to the testimony of the witnesses; and as the facts of the‘case are new, (in the Courts I mean,) and may form an important precedent, dependent altogether upon testimony, I will narrate it somewhat more at large than is usual, and precisely as reported to this Court.
Thomas Pulton, after proving the trading, swore, that Polydore was in the constant habit of trading with negroes, without tickets. Aud previous to this transaction, he cautioned the defendant about the conduct of the negro, and advised him to put a white man there. When defendant replied, his lawyer told him his having a negro there would be sufficient. He told defendant, that Polydore did trade with negroes,' without tickets. He thought it was after that time, that defendant put a white man there. The witness gave the corn to the negro to sell, and followed him and saw him sell the corn. g
P. Hanson was clerk for Anone, in 1817, and while he lived there, Polydore assisted him ; and when he was absent, Polydore had the principal management. While witness was sick, Polydore had the whole management. Anone directed the witness to buy all the corn he could, and if the negroes brought ten thousand bushels, to buy it. The witness remonstrated; to which defendant said he was not fit to do business. Polydore was there, and bought corn without tickets. The witness wrote several letters informing defendant that the negroes brought so much corn, that they must have stolen it. Anone came and told witness *to buy all he could get, and made no mention of tickets. He could *- not pretend to say, that Anone told Polydore to buy from negroes without tickets.
Samuel Jones lived with Anone, as clerk, and came away last of February, 1818. When this witness came away, he heard Anone tell Poly-dore to take care of every thing, and to do as well as he could, and all the money he got, to give it to Mrs. Quin. Polydore was as much a clerk as witness was, acting under the witness. Polydore was dealing there under Anone’s directions, and bought of negroes without tickets ; and defendant told witness to buy of negroes, and that it made no difference about a ticket. He never heard him give any directions to Polydore about a ticket. Defendant gave directions to this witness, and he gave directions to Polydore.
The presiding judge charged the jury, that if they believed the witnesses, the defendant’s directions to Jones showed the principle upon which the defendant carried on trade at his store; and would be sufficient to raise a presumption that Polydore acted under defendant’s orders of purchasing from negroes, without tickets ; and if such should be their view of the case, from his testimony, in connection with his evidence of the other witnesses, they were bound to convict the defendant. He added, *388 that it would be difficult to produce positive proof of guilt under this law, when the agent of dishonesty was a negro, who could not be examined.
Grimlce, for the motioD. Petigru, Solicitor, contra.
I conceive that this charge fairly left the inference to the proper tribunal, the jury; and the observation subjoined, was in the true spirit and policy of the act. In my judgment, the moment it was established that defendant carried on a systematic trading with negro slaves, rational suspicion must arise ; but add to this, that he instructed Ms clerks to deal to any amount with slaves, and these instructions given after the honest remonstrance of Mr. Hanson, (in the face too of his suggestions, that *the corn, from the large quantities, must be stolen,) and suspicion •J becomes opinion. But does this testimony stop here ? Ho. Polydore, acting as his clerk, was constantly, says Pulton, in' the habit of trading with negroes without tickets. He informed defendant of Poly-dore’s conduct, and cautioned him upon it. Yet the trade was still carried on ; and from his testimony, to an extent, and with a continued disregard for friendly caution, faithful remonstrance, and the laws of the country, as though he really apprehended that impunity was in proportion ' to the severity of Legislative enactments, and that the sword placed over the head of offenders against these laws had so long moulded in inactivity, as to have changed its temper and lost its edge.
To conclude, I believe I do no more than-express the concurring opinion of the Court, in saying that the same force of direct and circumstantial evidence would warrant the conviction of a master, charged with assassination, through the agency of his slave. Even in such a case, to require direct proof of specific authority to the slave, would go well-nigh to legalize that worst of crimes. Por in slave countries, whenever the crime of assassination prevails, it will be practiced through the means of slaves, as is well attested by historical instances. If, then, to prove this high crime, so perpetrated, we can only look for circumstantial proof, and implied instructions, well might Mr. Ellison observe, that whenever the agent of dishonesty is a slave, we must not look for positive proof of instructions. No, whenever a master makes his slav.e the minister of his crime, we can look for testimony only from his character and conduct, the object in view, the time, the place, and attending circumstances. These sometimes forge the links and clasps of truth ; develope, as in the very case before us, a vicious course, “ nnwhipt of justice strike the offender ^.q.-i *througk his covert conduct, and lay bare his hardihood to the J bone.
The motion for a new trial is unanimously dismissed.
Oolcock, Nora, Johnson, Gantt, and Bay, JJ., concurred.

 1 Bail. 642; 8 Rich. 32.

 3 McO. 308.

 1 Brev. 551; 1 Sp. 224.

 Post. 79.

 1769, 7 Stat. 199, § 3; 1818, 7 Stat. 121; 1791, 7 Stat. 262, § 4; 1799, 7 Stat. 299, § 38; 3 Brev. R. 500; 2 Tread. 657.

 See Act of 1834, 6 -Stat. 576, § 3; another Act of 1834, 7 Stat. 468, 3 Hill, 90; 2 Bay, 360.

 Reported 1 Brev. 551.

 7 Stat. 434.
*389 Sed per Our. tlie defendant did not know that the owner had sent him, and the Act makes it an offence to trade with a negro without a note or ticket in writing.
Motion discharged. MSS. Mr. Justice Non, Columbia, November, 1805.
See 2 Bail. 573'; Post. 281.

 Dud. 43; State v. McBride, 4 McC. 332; State v. Steadman, 8 Rich. 313; 1 Rich. 90 ; 2 Hill, 187.

 Ante, 30.