CROMER v. BOINEST.

1. A paper purporting to be a decree, rendered by one who is not a judge either *de jure* or *de facto*, is an absolute nullity, and may be so treated wherever met with. It would, therefore, present no questions proper to be considered by this court on appeal.

2. A decree of a court becomes operative as such from the time it is handed to the proper officer to be filed, and not from the time that the judge signs and dates it.

3. A Circuit Judge in this State holds his office "for a term of four years" only, and not thereafter until his successor is elected and qualified. After the expiration of that term, he is no longer a judge *de jure*.

4. A Circuit Judge during his term of office heard a case, and wrote, signed, and dated his decree, but did not file it until his term had expired, he and all parties concerned being at the time ignorant of that fact. A few days afterwards he was re-elected for another term, and at a special court subsequently convened he called this case for the purpose of re-signing his decree as of that date, as he did in other cases, but upon objection of the plaintiff to his considering the case then, he did not change the date, but returned the decree to the clerk. *Held*, that this was a valid decree of the court: (1) because the judge was a judge *de facto* when the decree was first filed, and (2) because the subsequent returning of the decree to the clerk was equivalent to a re-filing, if necessary, as of that date, even though not re-signed or re-dated, not ordered to be re-filed nor so marked. MR. CHIEF JUSTICE SIMPSON *dissenting*.

5. Upon the death of A intestate, his widow administered and filed her bill for the settlement of his estate, and creditors were called in. Two creditors presented claims—R a judgment and S a sealed note, upon which C was a surety. Afterwards R assigned to C so much of her judgment as would pay the S note, and C gave notice to the widow of his assignment. Some months later, the lands were sold and bid in by R for an amount less than was due on her judgment, but she took no deed. A year afterwards the court ordered all the estate (which was insufficient to pay R) to be turned over to R, and titles to the land, by R's direction, to be made to the widow for life, with remainder to her issue—all of which proceedings were known to C, although no party to the record. Five years afterwards C paid S, and a year later

brought this action to subject this land to the payment of his claim under his assignment. *Held*, that he could not recover

6. The purchaser at the judgment sale took the land freed from the claims of all creditors of the intestate, and a creditor could only thereafter look to the proceeds of sale; and under the circumstances, Mrs. R's purchase was complete without a deed—particularly when this was in effect affirmed by a decree of the court.

7. If the rights of C were ignored in these proceedings, it was the result of his own fault and *laches;* but his only right was against the proceeds of the sale, and not against the land itself.

Before FRASER, J., Newberry, November, 1886.

The opinion fully states the case.

*Mr. J. F. J. Caldwell,* for appellant.

*Mr. T. S. Moorman,* contra.

October 29, 1887. The opinion of the court was delivered by

MR. JUSTICE MCIVER. The question of jurisdiction raised by this appeal is one of the gravest importance, and must necessarily be first determined before any of the other questions presented can be properly considered. For if Judge Fraser, when he rendered the decree appealed from, was neither a judge *de jure* nor *de facto*, then it is quite clear that the paper styled a decree is an absolute nullity, and cannot present any question proper to be considered by this tribunal; and if it is an absolute nullity, then all the so-called decrees and judgments rendered by Judge Fraser, as well as every official act done by him after the termination of his term of office and before his re-election, are likewise nullities, and may be so treated wherever met with. This gives the question presented for determination far-reaching consequences of such a serious and important character as to demand the most thorough and careful consideration.

The facts out of which the question of jurisdiction arises are few and undisputed, and may be stated as follows: the case in which the alleged decree was rendered was heard on November 30, 1886, during a term of the court commencing November 8, 1886, and held continuously until and including December 6, 1886, on

which day the alleged decree was dated and filed, which was the first announcement or publication of the same, though it was actually prepared and written out prior to December 2, 1886—the day on which Judge Fraser's term of office expired. He was, however, re-elected a few days after December 6, 1886, and after his re-election, at an extra term of the court, held on December 31, 1886, he "called this case for the purpose of re-signing his decree as of that date, as he did in other cases, but upon objection of the plaintiff to his considering this case then, he did not change the date, but returned the decree to the clerk." Upon this state of facts there can be no doubt that at the time the decree in question was originally filed and announced, Judge Fraser was not a judge *de jure,* inasmuch as he was then out of office by the expiration of the term for which he was elected, and the important inquiry is, whether he was a judge *de facto ;* for the mere fact that Judge Fraser had prepared and written out his decree before the expiration of his term of office cannot affect the question.

The question as to what will constitute a *de facto* officer has been the subject of judicial inquiry in very many cases, both in England and in this country; and while it must be admitted that there is some conflict of opinion, it seems to us that the weight of authority, as well as argument, is against the view contended for by the appellant. According to that view, as we understand it, the mere fact that one is found in the exercise of the duties of an office, without question of his authority as such, is not sufficient to constitute him a *de facto* officer, unless he is in such office by some color of right or title, even though he may be apparently invested with all the insignia of office.

The *de facto* doctrine rests upon considerations of public policy and necessity. It was introduced into the law for the purpose of protecting the interests of the public as well as those of private individuals, where those interests were involved in the official acts of one who may be found exercising the duties of an office, though without lawful authority. Hence where a person is called upon to deal with such an officer, he is not bound to inquire whether his title to the office is good, and for a like reason it seems to us that he should not be required to inquire

whether such title is colorable. In fact, he is not called upon to inquire into the title of such an officer at all, but may safely assume that he is what he appears to be, and what the public generally regard him to be. As is said by Devens, J., in *Petersilea* v. *Stone* (119 *Mass.*, 465;—*S. C.*, 20 *Am. Rep.*, 335): "Third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office, even so far as to see that he has color of title to it by virtue of some appointment or election."

The case of *The State* v. *Carroll* (38 *Conn.*, 449;—*S. C.*, 9 *Am. Rep.*, 409), seems to be a leading case upon the subject. There, Butler, C. J., subjects the authorities, both English and American, to an elaborate review, and shows that the idea that there must be some color of right, derived from some election or appointment, in order to constitute one a *de facto* officer, is without foundation, and is based upon what he characterizes as "a brief, inaccurate, and deceptive report" of the case of *Rex* v. *Lisle* (2 *Strang*, 1090), as is shown by a fuller and more accurate report of the same case in *Andrews*, 163. On the contrary, he adopts the definition of a *de facto* officer, given by Lord Ellenborough in *Rex* v. *Bedford Level* (6 *East.*, 356), generalized from a previous definition given by Lord Holt, in *Parker* v. *Kett* (1 *Ld. Raym.*, 658), as follows: "An officer *de facto* is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law," which definition, he says, "has never been questioned since in England, and is now the rule there."

Without undertaking to go over all the cases cited in this elaborate opinion, it will be sufficient to refer to some, which seem to be more directly applicable to the question now under consideration. In *Knowles* v. *Luce* (*Moore*, 109), Manwood, J., is reported as saying, "that an officer continuing to exercise an office after his time had expired was a good officer *de facto.*" In *Rex* v. *Bedford Level, supra*, the question was whether a deputy recording officer, who continued to act after the death of his principal, was an officer *de facto ;* and the court, laying down the definition of such an officer, as hereinbefore given, held the acts of the deputy to be good until the death of the principal was

known, but not afterward, because after the death of the principal became known there was no longer any reason for the public to suppose that the deputy had authority to exercise the duties of the office, inasmuch as his appointment necessarily terminated with the death of his principal.

That case is, in principle, identical with the case under consideration; for Judge Fraser's legal authority as a judge undoubtedly terminated with the expiration of his term, on December 2, 1886, just as the legal authority of the deputy in *Rex* v. *Bedford Level*, terminated with the death of his principal, and if the acts of the deputy after such termination, and before the fact which gave rise to it was known, were valid, surely the acts of Judge Fraser after the termination of his office, and before such fact was known, would also be valid. When it became known that Judge Fraser's term had expired does not appear on the record, and it surely was the duty of appellant, if his appeal depends upon that fact, as we think it does, to make it appear; for certainly the court could not assume that Judge Fraser would undertake to exercise any of the functions of his office after his term had expired. On the contrary, the court, it seems to us, would much more readily assume, what was no doubt the fact, that all parties, as well as the judge himself, were in ignorance of the fact that his term had expired when the decree was originally delivered to the clerk to be filed.

In *Wilcox* v. *Smith* (5 *Wend.*, 231; 21 *A. D.*, 213), the question was, whether a person acting as a justice of the peace could be regarded as a *de facto* officer. It seems that he was reputed to be a justice of the peace, and had acted as such for three years—for the first year the town in which he resided was a part of the County of Genessee, and for the last two years it was a part of the County of Orleans. It was shown that he had not been appointed by the officers of the County of Orleans, nor did it appear that he had ever been appointed by the officers of the County of Genessee, though it was shown that he took the oath and acted as a justice while the town was a part of the County of Genessee. The court below charged the jury that there being no color of title by election or appointment, the process issued by him was absolutely void. But on appeal this

ruling was reversed, the court holding that where the interests of third persons were involved, and for the protection of such interests, the acts of the officer must be validated as those of a *de facto* officer, even though no color of election or appointment had been shown.

In *Gilliam* v. *Reddick* (4 *Ired.*, 368), the question was, whether an official act done by the register of Gates County, *after the expiration of his term of office*, was valid, and the court held that it was. In that case, like the present, the register was appointed for a fixed term of four years, without any provision for holding over. In that case the court refers to the previous case of *Burke* v. *Elliott*, in the same volume, in which the court said there must be at least some colorable election and induction into office *ab origine*, in order to constitute one a *de facto* officer, *or* so long an exercise of the duties of the office, and acquiescence therein by the public authorities, as to afford the individual citizen a strong presumption that the officer was duly qualified to act.

In *Brown* v. *Lunt* (37 *Me.*, 423), the question was, whether the official act of a justice of the peace, done after his term of office had expired, could be sustained as the act of a *de facto* officer, and it was held that it could. In that case the justice was appointed for one year, without any provision for holding over. He had been a justice for many years in succession, was not re-appointed, but continued to act, and took the acknowledgment of a deed about two years after his term of office had expired. One of the grounds upon which this decision seems to have been placed, although others are also stated, seems to have been that the fact of the justice having been originally lawfully appointed, his continuing to exercise the duties of the office without question, after the expiration of his term of office, afforded such color of right as seems to be required by some of the cases in order to constitute a *de facto* officer. The same principle seems to have been recognized by the Supreme Court of the United States in *Cocke* v. *Halsey*, 16 *Peters*, 71.

It will be observed that this ground is especially applicable to the case in hand. It is conceded that Judge Fraser was originally lawfully elected and duly qualified as judge, and that he had been for many years in the lawful exercise of the duties of that

office, and was so at the time this case was heard by him, and
this may be regarded as affording such color of right as seems to
be thought necessary by some to constitute a *de facto* officer.    It
is true that it seems somewhat paradoxical—not to use the
stronger term employed by the distinguished judge in the opinion
from which this is largely drawn—to say that an appointment to
an office for a specified term, can afford any color of right or
.title to such office for a longer period than the term specified,
yet when we consider the origin and foundation of the *de facto*
doctrine, and that it was introduced for the purpose of protecting
and preserving the interests of those who have been induced to
submit their rights to one who has the apparent authority to
determine them, the paradoxical character of the expression which
the terms used, considered apart from the subject to which they
are applied, might seem to imply, will disappear.

Now while, strictly speaking, an appointment to an office for
four years cannot well be considered as conferring even color of
title for any longer period, yet it may well be so regarded in the
connection and for the purpose for which the words—color of
right or title—are used in discussing this subject.    As we under-
stand it, those words are used to mark sharply the line between
one who intrudes himself into an office without any shadow of
right—a mere usurper—and one who enters upon an office or
continues in it under an honest, though mistaken, belief of his
legal right so to do, shared in by the public.    It seems no more
paradoxical to say that one who continues in the discharge of
the duties of an office to which he has been legally elected or
appointed, after his term had expired, in ignorance of that fact,
is being in said office under color of right, than it is to say that
one who exercises the duties of an office under an appointment
not authorized by law, though supposed to be so, does so
under color of right; and yet it has been held in this State
(*Taylor* v. *Skrine*, 3 *Brev.*, 516), as well as elsewhere, that one
who is in office by virtue of an election or appointment afterwards
declared to be unconstitutional, is in such office under color of
right, and therefore his official acts are valid as those of a *de fac-
to* officer.    Now if, as in the case just cited, the act authorizing
the appointment was unconstitutional, it was absolutely null and

void, and therefore could confer no authority whatever to hold the office, and at most was only *supposed* to do so; and this was what gave the color of right which invested the judge, whose official act was there brought in question, with the character of a *de facto* officer.

The same principle applies with increased force to the case of Judge Fraser. It is conceded that he was in office originally by legal authority, and the act which is now brought in question was done by him under the belief, shared in by the public, which afterwards proved to be a mistake, that such authority still continued. It was therefore done because of an authority originally legal, which, however, was mistakenly supposed still to exist, and it may, therefore, be said to have been done under color of such authority; for it cannot be doubted that Judge Fraser never would have undertaken to exercise the duties of an office after he knew that his term had expired, and his authority so to do had terminated. His act must, therefore, be referred to such authority, as done by reason of the belief that such authority still continued, that such authority was the color of right under which he acted. If, as in *Taylor* v. *Skrine*, an appointment to an office without any legal authority whatever, should be regarded as sufficient to invest the appointee with color of right to the office, solely because it was honestly, though erroneously, supposed that the appointment was lawful, surely an appointment originally made by lawful authority, and honestly, though erroneously, supposed still to continue, ought to be sufficient for the same purpose.

In *Sheehan's Case* (122 *Mass.*, 445; *S. C.*, 23 *Am. Rep.*, 374), the accused having been convicted before the police court, applied to be discharged under a writ of *habeas corpus*, resting his claim upon the ground that Hawkes, the justice before whom he was tried, was disqualified to hold the office under the constitution of Massachusetts, by reason of the fact that he had accepted a seat in the legislature. Gray, C. J., in delivering the opinion of the court, used this language: "But if Mr. Hawkes, upon taking his seat in the house of representatives, ceased to be a justice *de jure*, he was, by color of the commission which he still assumed to hold and act under, having the usual signs of judicial office—sitting in the court, using its seal, and attended by

its clerk—and no other person having been appointed in his stead, a justice *de facto.*" This language may very appropriately be applied to the present case, *mutatis mutandis.*

In *Petersilea* v. *Stone, supra,* the question was whether the service of certain process by one who had previously been appointed constable, but whose term of office had expired, and nevertheless continued to act, was valid. The court held that it was, the constable being a *de facto* officer, using the language hereinbefore quoted from the case. It is now again cited for the purpose of saying that it distinctly repudiates the idea that in order to constitute a *de facto* officer, he must have some color of right, arising from some election or appointment, and declares that the general terms used in the previous case of *Fitchburg Railroad Co.* v. *Grand Junction Railroad Co.* (1 *Allen,* 552), from which such an idea might be inferred, must be confined to that particular case, and cannot be regarded as stating fully and accurately the elements necessary to constitute a *de facto* officer.

In this State there does not seem to be any authoritative decision on the point under consideration. But there are judicial utterances which seem to us to be in accordance with the view herein presented. In *McBee* v. *Hoke* (2 *Speer,* at page 145), O'Neall, J., in discussing this subject, uses this language : "But I take the broad ground, that being found in an office, of which he had been the incumbent for many years, the plaintiffs had the right to regard him as coroner, and his acts for them are good. * * * One in office and transacting its duties is supposed to be rightfully there, and, so far as third persons are concerned, that presumption legalizes his acts." It is true, as said by Evans, J., in the subsequent case of *Kottman* v. *Ayer* (3 *Strob.,* 92): "These propositions, although not absolutely necessary to be affirmed in that case, and which may be supposed to be mere *dicta,* I propose to show are supported by all the authorities." This, too, may also be regarded as a mere *dictum,* inasmuch as the question involved in *Kottman* v. *Ayer* did not necessarily call for such a declaration of opinion. But when we find two such distinguished judges uniting in thus laying down the general doctrine of a *de facto* officer, no small support is afforded the view herein adopted.

It seems to us, therefore, that Judge Fraser must be regarded as a *de facto* judge on December 6, 1886, when the decree was originally filed in the clerk's office, and consequently that the decree must be regarded as a valid decree of the Court of Common Pleas.

But there is another ground upon which the validity of this decree may be sustained. There can be no doubt that, the case having been heard and considered before the judge's term had expired, it would have been entirely competent for the judge to have retained the papers during the interval between the expiration of his first term, and his re-election to his second term, and after such re-election filed his decree in the proper office, which would then unquestionably have been a valid decree; and there is as little doubt that he might, instead of retaining the papers, together with the decree, in his own possession, have left them in the custody of the gentleman who held the office of clerk until his return, after his re-election, and then formally delivered the decree to the clerk to be filed, and that such decree would then have been a perfectly valid decree.

Now, do not the facts stated in the "Case" show that he, in effect, did this? As we have seen above, it is there stated that when he returned, after his election to the extra court, he "called this case for the purpose of re-signing his decree as of that date, as he did in other cases, but upon objection of the plaintiff to his considering the case then, he did not change the date, but returned the decree to the clerk." There certainly was no necessity for the judge to re-sign the decree, or change its date, nor was there any need for "his *considering* this case then," as it had already been fully considered and his conclusions committed to writing before his previous term had expired There was literally nothing for him to do, except what he did do—place the decree in the hands of the clerk, whose duty it was then to have marked it filed. True, it is not stated in the "Case" that the judge directed the clerk when he returned the decree to him to mark it filed, but this surely was not necessary. Nor does it appear that the clerk did then mark it filed, but this was not essential to the validity of the decree, as is fully shown by the case of *Clark* v. *Melton* (19 *S. C.*, 498), as such omission may be corrected at

any time. The case was heard and determined by a judge holding a valid commission, and his decree is now found in the proper office, placed there by one having lawful authority so to do, and even if it should be conceded that it was originally placed in the office without any lawful authority, and has never been properly marked "filed," its validity cannot now be questioned.

Having determined that the decree rendered by Judge Fraser in this case a few days after his term of office had expired, and shortly before his re-election, was not thereby rendered invalid, it becomes necessary to inquire whether there are any such errors in that decree as are imputed to it by the appellant in his exceptions.

The facts necessary to a proper understanding of the points raised by the exceptions are substantially as follows : In September, 1871, T. S. Boinest died intestate, seized and possessed of some personal estate and of a tract of land containing three hundred acres, more or less, leaving as his heirs at law his widow, Ann E. Boinest, one of the defendants in this action, and four children, who are the other defendants herein. The widow having administered on the personal estate of the intestate, on September 23, 1873, instituted proceedings in the Court of Common Pleas for the settlement of the estate, asking, amongst other things, that the assets be marshalled and creditors called in and required to establish their demands. Under the call for creditors, only two claims appear to have been established, one a judgment in favor of Elizabeth Rikard, the mother of Ann E. Boinest, amounting to something over eight thousand dollars, and the other a sealed note to one Christian Suber for the sum of $634.57, payable one day after date, and dated July 7, 1869, upon which note the plaintiff herein was the surety of the intestate.

The judgment in favor of Mrs. Rikard having precedence over other debts, no money was ever ordered to be applied to the Suber note, the amount of the judgment being greater than the ascertained value of the whole estate. On November 8, 1875, Mrs. Rikard, in consideration of her connection with intestate as his mother-in-law, assigned to the plaintiff herein so much of the judgment in her favor as would be sufficient to pay the Suber

note, upon which, as stated, the plaintiff was intestate's surety, and on the same day Mrs. Ann E. Boinest received due notice of such assignment. Shortly after this assignment was executed, and before December 14, 1875, it was placed by the plaintiff in the hands of an attorney, who was then employed to take care of plaintiff's interests in the premises.

By virtue of an order of the court, made in the proceeding to marshal the assets of intestate's estate, the land was offered for sale on the first Monday in January, 1877, and bid off by Mrs. Rikard for the sum of twenty-three hundred dollars, the terms of sale being one-third cash and the balance on a credit of twelve months. Mrs. Rikard made no payment in money, and gave no obligation for the purchase money, but in September, 1878, the referee made his report, recommending that the balance of the personal estate, after the payment of costs and a special lien upon the life insurance fund of the intestate, together with Mrs. Boinest's claim of dower, should be turned over to Mrs. Rikard on account of her judgment, the amount of which was more than sufficient to absorb the whole estate, including the land; and as to the land, he recommended the adoption of a proposition made by Mrs. Rikard, in writing, to the effect that title to the land be made to Mrs. Boinest for life with remainder to her issue. This report was confirmed in February, 1879, and accordingly on March 21, 1879, the clerk of the court made a deed for the land to Mrs. Boinest for life and after her death to her issue, under which defendants have ever since been in possession.

These proceedings for the settlement of the estate of the intestate, as well as the sale of the land, were known to the plaintiff and his attorney, but no steps appear to have been taken for the protection of plaintiff's interests under the assignment, except that some time in 1879, but at what precise date is not stated, the attorney for plaintiff exhibited the assignment to the executors of Suber, and notified McCaughrin, who had by agreement become the receiver of the insurance fund, not to pay out the money, and said executors procured an order subrogating them to the rights of the plaintiff under his assignment and received a portion of that fund, amounting to something over five hundred dollars. Prior to this the said executors had obtained judgment

on the sealed note against Cromer, and on February 5, 1884, Cromer paid the balance due on said judgment, after deducting the amount received from the insurance fund, as aforesaid, which balance amounted to something over nine hundred dollars.

On March 20, 1885, this action was commenced, whereby the plaintiff seeks to subject the land to the payment of the balance of the Suber debt, which the plaintiff has been compelled to pay as the surety of the intestate. The Circuit Judge held that under the foregoing facts the plaintiff had made no case warranting the interposition of the court in his behalf, and therefore rendered judgment dismissing the complaint. From this judgment plaintiff appeals upon the several grounds set out in the record, which need not be repeated here.

We think that the conclusion reached by the Circuit Judge was clearly right. There can be no doubt that where the lands of an intestate, covered by the lien of a judgment, are sold by order of the court under proceedings to marshal assets, to which the judgment creditor was a party, the purchaser at such sale takes the land free from the lien of the judgment, and the only recourse of the judgment creditor is upon the proceeds of the sale. So that the real inquiry here is whether the land in question has been so sold. As to this we do not think there can be any question. The sale was undoubtedly ordered by a court of competent jurisdiction under a proceeding in which it had before it all the necessary parties, and under such order the land was offered for sale and bid off by Mrs. Rikard at an amount much less than the amount of her judgment, to which it was clearly ascertained that the proceeds were applicable. The fact that she did not comply in a formal manner with the terms of the sale by paying the cash portion of the purchase money and executing her obligation for the credit portion, certainly cannot affect the question. As she was the only party before the court entitled to the proceeds of the sale, it would certainly have been a wholly unnecessary formality for her to pay over the money with one hand and receive it back with the other.

But, when, in addition to this, we find that the course actually pursued was recommended by the referee as a practical compliance with her bid, and that such recommendation was adopted

and confirmed by the court, there cannot be a doubt that the sale was just as effectual as if Mrs. Rikard had, in the most formal manner, complied with the terms of the sale by paying the one-third in cash and giving her obligation for the balance. If she had done so, she certainly would have been entitled immediately to receive back again the cash payment which she had just made on her judgment, and would, no doubt, have obtained an order for the cancellation of her bond for the credit portion by receipting for its amount on the judgment which had been established in her favor, and then clearly she could have made titles to Mrs. Boinest and her issue, which would have been free from the lien of the judgment for the balance still due upon it. This, it seems to us, was what was, in effect, done under the express sanction and order of the court; and, therefore, we think that the defendants took the land free from the lien of the judgment, and it cannot, in their hands, be subjected to the payment of any claim the plaintiff may have, unless, after establishing his claim against Mrs. Rikard, if he has any, and pursuing her, or her estate to insolvency, he may be able, under proper proceedings for the purpose, to set aside the conveyance to the defendants as a voluntary conveyance to them by Mrs. Rikard. ·

But it is said that in all these proceeding the rights and interests of the plaintiff were wholly ignored. Even granting this to be so, the pertinent inquiry would be, whose fault was it, that such was the case? It will be remembered that any interest which the plaintiff may have acquired, under the assignment from Mrs. Rikard, was acquired pending the action under which the sale, now sought to be impeached, was made; and if the plaintiff neglected to take care of his own interests, he has no one but himself to blame. Both he and his counsel had not only constructive notice arising from the pendency of the action, but the evidence conclusively shows that they had actual notice of what was going on, and yet no step appears to have been taken to protect his rights, or even to bring the fact to the attention of the court that he had, or claimed to have, any interest whatever in the proceedings. But were the rights, which he is now seeking to set up, improperly ignored? Even if he had been made a party to the action, at the time the assignment was executed, he

could not have set up any claim to the land, or a lien thereon. His only claim would have been to the proceeds of the sale, to the extent necessary to satisfy his assignment, and that he omitted to make at a time when the court could have provided for such claim; and if, by his *laches*, the proceeds of the sale have been improperly applied, that gives him no right to go upon the land, which has been legally sold and conveyed to the defendants, who, perhaps, as is alleged, have made expensive improvements upon the land, in confident reliance upon the title made to them by order of the court.

It is contended, however, that until the plaintiff paid the debt upon which he was the surety of the intestate, "he had no *status* which enabled him to claim anything from the Boinest estate, real or personal." This does not seem to have been regarded as an insurmountable obstacle when the order was obtained subrogating the executors of Suber to the rights of Cromer, whereby the plaintiff was relieved from the payment of nearly one half of the debt; for that must have been obtained before the plaintiff paid any part of the debt, as he only claims to have paid the balance due, after deducting the amount received under such order. If the fact that the plaintiff had not paid the debt for which he was surety, was not then found to be any obstacle to an application for the recognition and protection of his rights under the assignment, it is not apparent why it should have been so when the court was proceeding to dispose of the proceeds of the sale of the land. Indeed, we cannot doubt that if the assignment had then been brought to the attention of the court in any way, some proper provision would have been made for the protection of the rights of the assignee.

But even assuming that the plaintiff could not before payment of the debt take any step to protect his interests under the assignment, which, however, we are not prepared to admit, then the inquiry would be, who was responsible for the delay? If the plaintiff delayed payment of the debt until urged to do so by the process of law, and in the meantime property or funds which he might have, otherwise, subjected to such payment, has got beyond his reach, the consequences of such delay must fall upon him and not upon others who were in no wise responsible therefor. It does

not seem to us, therefore, that, in any view of the case, the plaintiff can subject the land, in the hands of the defendants, to the payment of the amount which he has been required to pay as surety for the intestate.

Whether the plaintiff has any claim against Mrs. Rikard, or her estate (for it is stated in the "Case" that she is dead), for the amount of the proceeds of the sale which, in effect, were improperly received by her, in derogation of the rights of her assignee, we have not undertaken to consider. Her representative is not before the court, and it would not be proper for us even to intimate any opinion as to that question.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

MR. JUSTICE McGOWAN. The doctrine which sustains a decree between parties by a *de facto* judge, may seem at first view to be somewhat illogical; but it was originally adopted from the necessity of the case. and, as I think, is now well established. Any other rule would tend to unsettle the administration of the law, and render uncertain titles to property.

MR. CHIEF JUSTICE SIMPSON, *dissenting on the question of jurisdiction involved.* Not being able to concur in the majority opinion on the question of jurisdiction, I have filed a dissenting opinion as to that. I concur, however, in the majority opinion on the merits.

Inasmuch as the first question which presents itself in this case, is a question of jurisdiction upon which I think the appeal should be dismissed, it will not be necessary to state the general facts of the cause, or to discuss the questions arising thereon. It will only be necessary to state the facts upon which the jurisdictional question depends. The case was heard at the November term of the Court of Common Pleas, for Newberry County, 1886. This court was held continuously from November 8, 1886, till December 6, inclusive, Judge Fraser presiding, whose term of office expired on December 2. He was re-elected some time after this; so that there was an interval of       days between the expiration of his previous term, December 2, and his re-election.

The case below was heard before December 2, but the decree was dated and filed on December 6, during the interval, though it is stated in the "Case" that it had been written before the 2nd. The question upon these facts is, can this be regarded as a decree of a court? If not, there has been no judgment from which an appeal can be brought here, as we are only authorized to entertain appeals from judicial tribunals, and to correct errors at law of judicial officers.

It is admitted that the decree, though dated and filed after the expiration of Judge Fraser's term, was written before. Now, the question arises, and it is the first question in order—did the fact of its being written before, make it the decree of the court at that time and entitle it to be filed afterwards? In other words, when does a decree become the judgment of a court? Does it become so at the time it may have been prepared in the chamber of the chancellor, or when announced and filed in the proper office? It is well established, that a decree can have no lien on property until filed in the proper office, and it would seem, therefore, that so far as third parties are concerned, at least, until said filing there is no decree. But we have been referred to no case, nor have we found one ourselves, involving this precise point here, so that in adjudging it, having no aid from previous cases, either authoritative or otherwise, we must determine it according to our view of the construction to be given to the terms, decree and judgment.

A decree is defined to be, "to determine," "to order," "to determine judicially and decisively." And a judgment is the final determination of the rights of the parties in the action. Now, it appears to us, that nothing can be said to be determined decisively and finally by a judge until his determination is announced and promulgated. Up to that time, whatever may be the conclusion of his own mind, this conclusion is subject to change and alteration. Previous to promulgation there can be no order, nor can parties take notice thereof, or be bound thereby. And certainly while it is in the breast of the judge it can have no effect whatever. It can neither be assailed, set aside, enforced, nor enjoined, for the reason that it has no existence.

It is conceded that the term of Judge Fraser of which he was

in possession at the time the cause was heard had expired when his decree was filed, and that at that time he had not been re-elected. He was not, therefore, a judge *de jure*. Was he a judge *de facto?* In the case of *Kottman and Wife* v. *Ayer* (3 *Strob.*, 92), the old Court of Appeals fully discussed the question of officers *de jure* and *de facto*, citing all the cases decided up to that time. That was a case in which a magistrate had taken a relinquishment of inheritance by a married woman, after he had been appointed, but before he had qualified; in fact, he never qualified under this appointment. The court held the relinquishment valid, because the magistrate was at least a *de facto officer*, on the ground that he was in office by appointment, and was actually discharging the duties thereof, thus coming under the general principle, which the various cases cited in the opinion sustained, to wit: that where the electing or appointing power has conferred the office on one, and he is in the actual discharge of its duties, without his title being questioned in any legal way, the community in which he lives have a right to regard him as a legal officer, and his official acts as to them are valid, the court, in substance, saying that where the usual evidences of official right are united, viz., appointment to and the actual discharge of the duties of the office, the acts of the officer as to third parties are valid, because he is a judge *de jure*, if his appointment was legal and he had qualified, and at least *de facto*, even if his appointment was insufficient, yet affording a color of right. And this seems to be the result of all the cases referred to in that opinion, and of all the cases that we have been able to find, to wit: a *de facto*, as distinguished from a *de jure*, officer is one in office under some color of right, either an appointment, or an election, or in some way by an authority claimed to have been exercised in his behalf, and then actually discharging the duties thereof, in whole or in part.

It is true that in some of the cases general phrases have been sometimes used, which, if construed literally, would include all those who were actually discharging the duties of the office, whether he had any color of right thereto, by a claimed appointment or election, or not. But upon an examination of the decided cases in which the officer has been held to be a *de facto* one, it

will be found that he was in office by virtue of some appointment which was claimed to afford a colorable right at least. The case of *Kottman* v. *Ayer, supra,* cites many cases on this subject, including several marking the exceptions to the doctrine herein, and as we have said, in some of them strong expressions are found extending the *de facto doctrine* to those in the exercise of an office whether under color of right or not. For instance, O'Neall, J., in *McBee* v. *Hoke* (2 *Speer,* 145), said: "But I take the broad ground, that being found in an office, of which he had been the incumbent for many years, the plaintiff had the right to regard him as coroner, and his acts for them are good. * * * One in office and transacting its duties is supposed to be rightfully there, and, so far as third persons are concerned, that presumption legalizes his acts." And Evans, J., in *Kottman* v. *Ayer* (3 *Strob.,* 92), in referring to these propositions laid down by O'Neall, J., said: "These propositions, although not absolutely necessary to be affirmed in that case and which may be supposed to be mere *dicta,* I propose to show are supported by authority." And in the case of *Ex parte Norris* (8 *S. C.,* 473), Willard, A. J., said: "That to constitute an officer *de facto,* he must have a presumptive or an apparent right to exercise the office, resulting from either full and peaceable possession of the powers of such office, or reasonable color of title, with actual use of the office."

Upon an examination, however, of the facts in the cases in which these expressions were used, it will be found that in each the officer was in possession of the office in question by some color of right, either appointment or election, and, therefore, the question considered was not really involved. Hence these propositions must be regarded as mere *dicta.* But, be that as it may, and assuming that the law as announced in these broad propositions is the true doctrine on this subject, was Judge Fraser in the full and peaceable possession of the office to the duties of which the filing of the decree in controversy belonged, so far as the parties litigant are concerned, at the time when he filed said decree? It is conceded that at that time his term had expired, and the office was actually and legally vacant. Now, if with a knowledge of this fact, and with the acquiescence of these litigants,

he had gone on and exercised the functions of a second term, then perhaps it might be said that he was in the full and peaceable possession of the powers of said second term, to which he was afterwards elected, and under the principle announced above by Willard, A. J., he might be regarded as a *de facto* judge at that time. But these are not the facts. On the contrary, Judge Fraser overlooked the fact that his term had expired on December 2, and he filed the decree as of that term, the parties litigant not being present, and not acquiescing in any way in such filing. It does not seem to us that in the exercise of a single judicial function like this and under these circumstances, that it can be rightfully said that he was in the full and peaceable possession of the powers of the office to which his act belonged, to wit: the second term, and that such should bind parties who were not present, and who in no way contributed to it.

In the case of *Wilcox* v. *Smith* (5 *Wend.*, page 234; 21 *A. D.*, 213), Sutherland, J., said: "It will be observed that these cases * * * do not go upon the ground that the claim by an individual to be a public officer, and his acting as such, is merely *prima facie* evidence that he is an officer *de jure*, but the principle they establish is, that an individual coming into office by color of an election or appointment, is an officer *de facto*, and his acts in relation to the public or third persons are valid until he is removed, although it be conceded that his election or appointment was illegal. His title shall not be inquired into. The mere claim to be a public officer, and the performance of a single, or even a number of acts in that character would not perhaps constitute an individual an officer *de facto*. There must be some color of an election or appointment, or an exercise of the office, and an acquiescence on the part of the public for a length of time which would afford a strong presumption of at least a colorable election or appointment." The above as it appears to me is the correct doctrine. And I do not see how it can be said that Judge Fraser was in the possession of the vacant office to which his decree belonged, and that the public had acquiesced in this, when neither he nor the public knew that said office was vacant, and when, instead of claiming the new term, he supposed that his

previous term had not expired, and the filing of the decree was by virtue of his powers incident to that term.

I conclude, that the previous term of Judge Fraser having expired when he filed the decree, the filing could not attach to that term, nor could it be referred to the second term, because at that time he had not been re-elected, nor was he claiming to exercise its duties by any color of title nor by actual possession of the vacant office. He was, therefore, neither a *de facto* nor a *de jure* officer. The case of *The State* v. *Anone* (2 *Nott & McC.*, 30), relied on by the respondent to the position, that no objection having been made at the trial, none can be made now, does not apply here. Judge Fraser had the right to hear the case, because at the hearing his office had not expired, and the appellant, therefore, could not have objected then, and after the decree was filed, it was too late to object. It seems, however, that when Judge Fraser returned after his re-election, to hold an extra court, and some proposition was made to sign and promulgate the decree, the appellant did then object.

It being my opinion that Judge Fraser was neither a *de facto* nor *de jure* judge at the time the decree in question was filed, it follows that said alleged decree, in my opinion, is not the judgment of a court, and, therefore, is not within the jurisdiction of this court on appeal, upon its merits.

Judgment affirmed.