# SPRING-SPECIAL TERM, 1898.

## CHARLESTON.

STATE *v*. CROSS.

DENT JUDGE, (*dissenting*).

Submitted September 13, 1897—Decided March 19, 1898.

1. CRIMINAL LAW—*Pleas of Former Acquittal or Conviction—Sufficiency of Pleas.*

    Pleas of former acquittal and former conviction are treated with liberality as to their structure, not requiring the certainty of pleas in abatement, or even of indictments. They must, however, state sufficient facts to show the party entitled to those defenses. (p. 317).

2. CRIMINAL LAW—*Pleas of Former Acquittal or Conviction—Sufficiency of Pleas—Record.*

    Pleas of former conviction or acquittal must state the offense involved in the former trial, its identity with that involved in the second prosecution, and the identity of the person of the accused, with the person before tried, and must vouch the record of the former trial. (p. 317).

3. CRIMINAL LAW—*Pleading—Former Trial.*

    Where a former conviction or acquittal was on the same indictment still being further prosecuted, no plea of former conviction or acquittal is necessary. Objection to being further tried, or a motion in arrest of judgment, gives the accused the benefit of the former acquittal or conviction. Otherwise where former trial was upon another indictment in the same or other court. (p. 319).

4. CRIMINAL LAW—*Murder—Voluntary Manslaughter—New Trial.*
   Where a party is tried upon an indictment for murder, and found guilty of voluntary manslaughter, and obtains a new trial, though the verdict is silent as to murder, he cannot be tried again for murder.   (p. 319).

5. CRIMINAL LAW—*Murder.*
   Can one found guilty of murder in the second degree be tried again for murder in the first degree? Not now decided.   (p. 321).

6. CRIMINAL LAW—*Felony—New Trial.*
   If one convicted of felony asks and obtains a new trial, the former conviction does not acquit him or prevent his retrial, as he waives the jeopardy of the former trial.   (p. 322).

7. CRIMINAL LAW—*Pleading—Jurisdiction of Court—Former Trial.*
   In order that a plea of former conviction or acquittal shall avail as a bar to further prosecution, the court must have been one with authority and jurisdiction to try the party.   (p. 321).

8. SPECIAL JUDGE—*Order—Record.*
   Chapter 49, Acts 1897, prohibits the election of a special judge, where the regular judge is present holding the court, unless the court by the regular judge enters of record an order for such election, reciting the facts specified in the act  Where the record shows the absence of such order, the special judge has no authority or jurisdiction, and his proceedings are void.   (p. 322).

9. STATUTES—*Clerical Errors—Legislature.*
   Mere clerical errors in a statute will be disregarded, or read as corrected, where the true intention of the legislature is manifest from the statute.   (p. 323).

10. STATUTES—*Amendment of Code—Clerical Errors.*
    Where a statute amending a section of a given chapter of the Code refers to the section by the wrong number, and it is manifest from the title and body of the statute that another section was intended to be amended, the error as to the number of the section will be disregarded, and the statute will be applied to amend the proper section.   (p. 324).

11. SPECIAL JUDGE—*Election.*
    Chapter 49, Acts 1897, amends and re-enacts section 11 of chapter 112 of the Code of 1891, and not section 2 of said chapter 112. Said section 2 is not repealed or affected by said chapter 49. (p. 325).

Error to Circuit Court, Ritchie County.

Frank Cross, convicted of murder in the second degree, brings error.

*Affirmed.*

ROBINSON & FIDLER, for plaintiff in error.

BRANNON, JUDGE:

Cross was found guilty of murder in the second degree, and sentenced to the penitentiary, and sued out this writ of error.

He offered two special pleas, which were rejected on demurrer. One sets up that he had been tried by a jury, and found guilty of voluntary manslaughter, and the court, of its own motion, set the verdict aside, and thus acquitted him, and prayed judgment of discharge. This plea is bad. A plea of former conviction or acquittal, called a plea of *autrefois convict* and *autrefois acquit*, is, unlike a plea in abatement or other dilatory plea, a plea in bar, is viewed with liberality, and may be of less definiteness and certainty than an indictment. Technical accuracy is not required, but it must aver all facts essential to the defense. 9 Enc. Pl. & Prac. 632, 633; 11 Am. & Eng. Enc. Law, 964; 1 Bish. Cr. Proc. § 808. This plea does not name the person whom Cross was charged with murdering. It does not in any wise aver that the felony for which he had been tried was the same for which he was being then prosecuted. It does not say he was being prosecuted further on the same indictment. It does not say for what act he had been tried, unless we infer that it was homicide from the use of the word "manslaughter." We may indulge in a weak inference that he had been found guilty of manslaughter upon the same indictment, but it would be mere inference. It names the court in which the former trial occurred, but does not aver that it had lawful jurisdiction of the case. The plea fails in such essentials. 9 Enc. Pl. & Prac. 634; 11 Am. & Eng. Enc. Law, 964; 1 Bish. Cr. Proc. § 810; *State* v. *Evans*, 33 W. Va., 417, (10 S. E. 792); *Justice's Case*, 81 Va. 209; 3 Greenl. Ev. § 36. The plea does not vouch the record; that is, after alleging the proceedings on the former trial to show the essentials of such plea, say, "as by the record thereof fully appears," or equivalent expression. This seems necessary. I would think it would suffice to aver facts shown by the record, and then prove them by it, making the record mere matter of proof; but this does not seem to be so on authority. 9 Enc. Pl. & Prac. 635; *Wortham's Case,* 5 Rand. 669; *Myers' Case,* 1 Va. Cas.

188; 1 Herm. Estop. § 424.    The forms give this voucher.
1 Bish. Cr. Proc. § 810; Whart. Prec. Ind. 1150.    This plea
consists of two parts,—one matter that must be shown by
record, the other identity of offense and person of the ac-
cused; one triable by the court by record, the other by
jury. If the State wishes to deny that there is such record,
or that there is a variance, or that it has the legal effect
imputed to it, it replies *nul tiel* record (no such record), and
the court at once tries the issue on that plea by the record,
and if found against the record the plea fails, and the de-
fendant answers further; and if sustained, and there is no
replication denying the identity of the offense and person,
there is judgment of discharge, and if there is such repli-
cation a jury tries the question of fact.    2 Bart. Law Prac.
1035.    The other plea is better, as, though it does not
name the person whom he was charged on the former
trial to have killed, yet it alleges that he was found guilty
of voluntary manslaughter "as charged in the said indict-
ment," which can mean no other indictment than that on
which he was about to again be tried, and it alleges identity
of the offense and of the accused.    But it does not vouch
the record.    And, as to both pleas, I will say that they pre-
dicate a right to absolute discharge on account of the ver-
dict of manslaughter, and the judgment they pray for is
total discharge from further prosecution.    No such judg-
ment could be rendered on them, as a verdict of man-
slaughter would not acquit from further prosecution for
that degree of homicide.    If the first plea were good, if
found true, as the demurrer admitted it to be, it might
have called for discharge, since it says that the court, of
its own motion, set the verdict aside.    It is not necessary
to say whether it would have called for final discharge, be-
cause it was bad and properly rejected.    It may be that,
if good, it would not have called for final discharge, but
that, as the order setting the verdict aside was only interlo-
cutory, it could be recalled, and judgment entered on the
verdict.    The second plea does not tell us what became of
the verdict, yet prays a discharge.    How could it, if the
verdict still stood?    The State would be entitled to judg-
ment on it.    The second plea, and may be the first, ask
judgment which could not be given on their own showing,

and hence arc bad, as a plea must ask a judgment which its facts warrant.   If good on their face, we might say that, though they could not obtain judgment of final acquittal, yet they would operate as far as their facts called for; that is, no further prosecution for a degree of homicide higher than voluntary manslaughter.   Both pleas were properly rejected on demurrer,

But the record shows upon this same indictment a former trial and verdict for voluntary manslaughter, set aside by the court, and a second trial, not limited to manslaughter, but for murder, and a conviction of murder in the second degree.   No plea of such former conviction of manslaughter was necessary; clearly not.   Such plea would be necessary if the verdict had been in another court, or in the same court upon another indictment, because a plea would be necessary to present in this case extraneous matters from another record; but the court will take judicial notice, or, more correctly speaking, will look through the entire record of the case, and must take its steps with eyes open to all in the record which it is bound to see.   In *Foster* v. *State*, 25 Tex. App. 543, (8 S. W. 664, note 4 in 9 Enc. Pl. & Prac. 635); it was held that no plea was in such case necessary, not, as there stated, that, if a plea is used, it need not vouch the record.   The defendant could avail himself of the former conviction against further prosecution by objection to being put on trial for a higher offense than manslaughter, before the second trial, or, after verdict on the second trial, he could do so, as he did, by motion in arrest of judgment, as this motion required the court to scan the record to discover any error in it, or anything preventing judgment on the second verdict.

This motion in arrest of judgment brings us to an important matter, which has not, so far as I know, been decided in this State.   What is the effect of the first verdict? I answer that, if it is not void, it forbade a trial for murder, and limited the second trial to manslaughter.   Upon an indictment for murder, the jury can find the defendant guilty of murder in the first or second degree, or voluntary or involuntary manslaughter. It not only can, but must, consider and decide of what degree of criminal homicide, if any, he is guilty; and, when once it decides that he is guilty

of voluntary manslaughter, it logically and inevitably follows, in a legal point of view, that the jury considered the whole scope of the case, all the degrees of the offense, and found him not guilty of a degree of crime above voluntary manslaughter. If guilty of only manslaughter, he cannot be guilty of murder, as his act is found free of that element indispensable in murder, malice aforethought. Judge Daniels, in *Livingstone's Case*, 14 Grat. 592, held this doctrine; but two out of three judges insisted upon remanding the case for new trial on the indictment, without limiting the new trial to manslaughter, in view of some older cases where there had been no limit imposed on the retrial. In those cases the question was not raised. So it stood, without decision of the question, in Virginia, until *Stuart's Case*, 28 Grat. 950. That was an indictment for malicious stabbing, and it was held that, as there was a verdict for unlawful assault, it prevented a second indictment and prosecution for malicious stabbing, as it negatived the presence of malice in the act, and acquitted him of malicious stabbing. The court said that like principles would, by analogy, say that where there is a conviction of manslaughter it operates as an acquittal of murder. I think that is clear. If the act is malicious, and produce death, it is murder; if not resulting in death, it is malicious wounding; if death ensue, but the act is not malicious, it is manslaughter, if criminal; and, if death do not ensue, it is unlawful wounding, not malicious. The principle is the same, and the ruling of the court inevitably does apply, as that court applied it, to prosecution for murder. That a conviction of manslaughter bars a prosecution for murder is held by the great weight of authority, as will appear from the Virginia cases above cited, and 11 Am. & Eng. Enc. Law, 940; 1 Bish. New Cr. Law § 1056; Whart. Cr. Pl. & Prac. § 405. If, on the indictment in the first trial, there could have been a conviction for the offense for which the prisoner is later prosecuted, his conviction discharges him. It is clear, by authority imperatively binding this Court, that where there are different counts in an indictment, and the verdict finds the party guilty on one or more, though silent as to the others, it operates as to an acquittal on the others by inevitable implication, because all the counts were the sub-

jects of decision before the jury, and, by selecting those
counts on which the party is guilty, the jury necessarily
found him not guilty on others.    The court should render
judgment of acquittal on the counts on which he is not
found guilty, though the verdict is silent as to them, and,
if the court omits such judgment, the law enters it.    *Lith-
gow's Case*, 2 Va. Cas. 297; *Bennet's Case, Id.* 235; *Kirk's
Case*, 9 Leigh, 627; *Stuart's Case*, 28 Grat. 950, 953. I say, as
Judge Daniels said in *Livingstone's Case, supra*, that a par-
ity of reasoning infallibly tells us that, where there is but
one count for murder, a verdict of manslaughter acquits
of murder.    The indictment, including all degrees of
criminal homicide, is before the jury in the one case, and
the indictment, including all the counts, is before the jury
in the other.    I desire to say that I am not deciding that
where there is a verdict of murder in the second degree,
which is set aside, there may not be a conviction afterwards
of murder in the first degree.    In murder in the first de-
gree there is malice, and willfulness, deliberation, and
premeditation; and whether a verdict of murder in the sec-
ond degree is to be held as finding only malice, and nega-
tiving willfulness, deliberation, and premeditation, I do
not say.    It was held in *Brigg's Case*, 82 Va. 554, that it
does not prevent a conviction of murder in the first degree.
But I note that Virginia has a statute, enacted in 1877,
which we do not have, providing that, if a new trial be
granted, it shall be as if no verdict had before been ren-
dered.

I said above that, if the verdict of manslaughter is valid,
it bars a prosecution for murder; for it is clear, on prin-
ciple and authority, that if the court in which was the for-
mer acquittal has no jurisdiction, or if the judge holding
the court is no judge, and not authorized to put the party
on trial, or impanel a jury, the proceeding is *coram non
judice* and no legal jeopardy existed, and its action consti-
tutes no bar against the further prosecution.    "Judg-
ment, if not by the proper judge, is of no effect."    Hawes,
Jur. § 35. 1 Bish. New Cr. Law, § 1028, says: "If the
court has no jurisdiction of the offense, or if the statute
creating it is unconstitutional, or the term it is holding is
unauthorized, or otherwise it has no power over the thing,

the defendant is not in jeopardy, however far the tribunal proceeds.   In most or all of these circumstances the final judgment is not voidable, as mentioned in a previous section, but void; so that his unreversed conviction is no more a bar to another prosecution than his acquittal." Black, Judgm. § 516, says:   "The validity of a judgment as a bar depends primarily upon the organization and character of the tribunal from which it professes to emanate.   And it is, first of all, requisite that the judgment should have been rendered by a legally constituted court,—one known to and recognized by law." 1 Herm. Estop. § 424. *Van Slyke* v. *Insurance Co.*, 39 Wis. 390, gives a clear view of this subject.

In March, 1897, an order was made in the case stating that, under a recent act of the legislature, the election of the special judge was void, and setting aside the verdict of manslaughter.   If such election was void, this order would be correct; if not, it would not be correct; and, if the accused had not asked a new trial, he could at least insist upon being sentenced for manslaughter only, and could reverse the verdict of second degree murder; but as he asked a new trial, it would not prevent a retrial for manslaughter,—would not work his acquittal. *Younger* v. *State*, 2 W. Va., 579; *Livingstone's Case*, 14 Grat. 593.   Is the verdict void?   The record states that on February 23, 1897, the regular judge being on the bench, but being so situated as to render it improper to preside at the trial of "certain causes," the clerk held an election of a special judge "to preside thereat."   The cases in which the special judge was to preside are not named.   This cause is not named.   It was not an election for this cause.   No order of the court to hold such election appears, but, it was held by the clerk, the attorneys being the electors.   It was held under section 11, chapter 112, Code 1891, in ignorance of chapter 49, Acts 1897, which had gone into force three days before this election.   This new act provides that "no such election" of a special judge shall take place, when the regular judge is present (as the record shows he was), without an order of court "entered of record, reciting the cause for such election, and naming the cases in which it is necessary to have a special judge," and in each case no-

tice is to be given to the attorneys of the parties.    Observe
that these directions are not merely directory, but man-
datory, because the statute is prohibitory.    It prohibits an
election without a previous order by the regular judge.
He is to say whether it is necessary.    He, as a public
sworn official, is to say whether it is proper to charge the
public treasury with the costs of a special judge.    So the
law is writ, whatever be the reason.    Our Constitution
gives the legislature power to provide for holding circuit
courts where the judge fails to attend or cannot preside.
This requires an enabling act.    This enabling act is the
sole authority for the election of a special judge, and it
must be substantially complied with.    It says that a con-
dition precedent is an order of the regular judge.    "Where
the constitution prescribes a mode of selection of a sub-
stitute or special judge, and indicates the causes which will
justify such selection, it excludes other modes of selec-
tion and other causes."    12 Am. & Eng. Enc. Law, 25.
"It is held under the statutes of some of the states that
the facts must appear of record, or the proceedings of the
special judge are void, because the statute especially re-
quires the causes to be entered of record."    Works,
Courts & Jur. 390.    Our statute prohibits election without
order, and that order, the cause of election, and the case
to be tried must be shown of record.    So, under this late
act, there was no lawful election    The special judge was
not a judge, and there can be no court or jury without a
judge.    I do not imagine for a moment that a sentence
could be imposed on the prisoner under that verdict, and,
if not binding on him, it is not on the State.

As to chapter 49, Acts 1897, it appears to me to be im-
portant to refer to the fact that it amends and re-enacts
section 11 of chapter 112 of the Code, instead of section 2.
This misnaming of the section is clerical error.    We look
at the intent of the legislature in a given act as we do the
act of private parties in a deed.    We look at the legislation
in this act, and we see plainly that it relates to section 11 of
the Code of 1891, and has not the faintest reference to the
matter of section 2.    We see that the intent was to legis-
late upon the subject of special judges, not upon the sub-
ject of the jurisdiction of circuit courts, which is the sub-

ject of section 2. The legislature did not intend to wipe out that important section 2. It has merely erred in giving the number of the section intended to be acted on. That would be *falsa demonstratio*, false description, which is always rejected when other matter of the act or deed or other instrument speaks the real purpose. The act affects section 11, not section 2, of chapter 112. "Clerical errors may be read as amended." End. Interp. St. § 319. "In fact, a mistake apparent on the face of an act, which may be corrected by other language of the act, is never fatal." "In all such cases it may, with propriety, be said that the context rectifies the error, and it is not the court that assumes to correct the legislature." *Id.* "An act being by clear mistake, entitled a supplement to the act of 27th Febuary, 1867, but intended to be a supplement to that of 13th April, 1867, was to be read with the effect of not reviving the local act of 27th February, 1867, which had been repealed by the general act of 13th April, 1867." *Id.* Other instances of clerical mistakes corrected are there given. Suth. Stat. § 260, says: "Legislative enactments are not, any more than any other writings, to be defeated on account of mistakes, errors, or omissions provided the intention can be collected from the whole statute, and the title and preamble may be referred to for this purpose. Where a law, possessing all the requisites of a valid act, is passed, containing clear requirements capable of being carried into effect, in connection with other statutes on the same subject, a mistaken reference to them will not defeat the will of the legislature and render it void. Thus where an act purporting to be an amendment of another act describes it truly, except that it incorrectly states its date, the erroneous statement will be treated as surplusage or corrected by construction. So, references to other sections or statutes, incorrectly made, will be corrected where the context or other particulars identify the statute or other provision intended, and enable the court to follow the reference with certainty." A construction leading to absurdity will not be given. End. Interp. St. § 320. It would be absurd to say that, when the title and words of the act refer to special judges, it shall fail as to that, and repeal section 2, touching the whole jurisdiction of circuit

courts. I have said so much on this point, as I have heard, that it has been suggested that if chapter 49, Acts 1897, is valid, it repeals section 2, chapter 112, Code, giving jurisdiction to circuit courts. This is not so. That section stands, and section 11 is amended and re-enacted by the new act.

It is assigned as error that the court allowed witness Gilbert, after he had stated that he went close to accused after the homicide to see if he had been drinking, and the prisoner stated to Gilbert that he (Cross) had been drinking, to tell the jury what evidence of drink he found, and he answered: "This all occured at the same, or about the same, time,"—that is, what he stated as to the· prisoner's conversation. I see no objection to this. The State had a right to disprove or prove intoxication in this way.

We see no objection to the statement of the justice holding the preliminary examination that, after the prisoner had been sworn as a witness, some one suggested that the pistol had not been found, and he had him stand up, searched his pockets, and found a pistol. A statement of the prisoner on the witness stand could not be given in evidence. *State* v. *Hobbs*, 37 W. Va., 812, (17 S. E. 380). This was no statement. The fact that a pistol was found, if material, was admissible, no matter how it was found, even if the prisoner's right was violated, as it was not, by the search. But Cross did not deny, but admitted, that he had a pistol and that it killed his sister. How, then, could the discovery of the pistol on his person hurt him? Cross did not object to the search. *Baker's Case*, 33 W. Va., 319, (10 S. E 639) upholds this evidence.

There is nothing in the matter contained in bill of exceptions 5. It is assigned as error that the wife of Cross was sent before the grand jury which found the indictment. We do not know that Rosy Cross at the foot of indictment is his wife. If so, other witnesses were before the grand jury, and we cannot say the indictment was wholly or in part based on her evidence. And we could not quash an indictment for incompetent evidence. And, if a good objection, it should have been pleaded in abatement. There is no objection to asking Garrison, "Was the pistol loaded when you let him have it?" and, "How many loads were in

it ?"   The State had a right to show that the accused, before the shooting, obtained a loaded pistol, to show purpose and intent.   It had a right to show that the pistol was loaded, as bearing on the question whether it was probable the accused would, without evil intent, do the reckless act of handling, in a room where there were numerous persons, a loaded pistol.   It bore on the probability or improbability of accidental shooting, as a circumstance proper for the jury.   There is plainly nothing in the evidence of Wells that was objected to.

Finally, as to the motion for a new trial.   Cross admits that he killed his sister by a shot from a pistol; but pleads that it was accidental, owing to its unintentional discharge, while handling or "fooling" with it.   Three juries have negatived this plea,—one sentencing him to the penitentiary for life, the second finding him guilty of voluntary manslaughter, and the third of second degree murder. Two of these verdicts have been approved by two different judges,—Judges Jacobs and Blizzard.   Many witnesses and circumstances were before the jury.   Evidence was before the jury going to show that a few hours before the shooting Cross went to the house of Garrison, and asked the loan of a revolver.   He said as a witness that he did not get it at the house, but elsewhere, in a scuffle, saw it in young Garrison's pocket, and took it out, denying Garrison's evidence, and seeking to show that he did not go expressly for the pistol.   He says that he wanted the pistol to defend himself, as he had heard that a dance to be held at his house the night of that day would be broken up by violence.   He says he did not know the revolver was loaded, yet he made no quest anywhere for ammunition, and the revolver had four charges in it.   Strange, that he would get an empty revolver to defend himself, and keep it for hours without effort to get ammunition.   He and his wife went to the sister's house Thursday afternoon, and she went in the house while he went to a railroad station and procured alcohol, and drank some, and then went to his sister's, finding there his wife and sister, her three small children, and a hired girl, Maggie Delancy, and took up and fondled one of the children.   He then took from his pocket this revolver, and brandished it.   His

wife remonstrated, and he pointed it at her, and said, "You speak two words, and I'll shoot you." This conduct produced such a feeling that Maggie Delancy fled to the kitchen, as did the largest child. His sister, Mrs. Taylor, told Cross to be careful, as he might shoot one of her children. In a minute or so this pistol was somehow discharged into the breast of Mrs. Taylor, killing her right away. He said he tried to put the revolver away on a shelf, then in a cupboard, but they were crowded with things, and he found no place for it. Strange story. Cross, after the shot, was in a state of perturbation. He at once hid the pistol. He said to Maggie Delancy, "Don't tell this; you know I was drunk." Some evidence showed that he was intoxicated, while other evidence would show that he was not much so. Did he thus prepare to harden his heart for the act? His sister on several occasions had upbraided and blamed him with keeping bad women at his house with his wife, and on the previous Sunday they had hot and angry words about it, he being angry, and saying he would keep whom he pleased in his house. On this account there was ill feeling between them, on his side especially, as would be natural. A witness not examined until the last trial, Georgia Jones, staying at the time at Cross', stated that Cross that day came into the kitchen where she and Mrs. Cross were, showed the revolver, and said that he was going to kill somebody with it before sundown that night. This pistol would not stand cocked. Why did he raise its hammer in this full room? I note that at once upon the act he did not plead accidentalness, as natural, truthful impulse would suggest, but pleaded the excuse of drunkenness. Cross was at the bar of the court, and was a witness, so that the jury scanned him and his evidence. So with the other witnesses. We do not enjoy this means of passing on the evidence. How can we make a jury out of ourselves, and go into the business of nicely weighing evidence and drawing inferences from it, and passing on the credit of witnesses? That is a jury function. We cannot disregard this third verdict of guilty without making jury trial a shadow and mockery, and converting the administration of criminal justice into a farce. We therefore affirm the judgment.

DENT, JUDGE, (*dissenting*):

I dissent from the opinion in this case, for the reason that the special judge appointed, and under whom a jury properly selected found a verdict of involuntary manslaughter, was at least a *de facto* judge, whose proceedings were binding on the prisoner and State alike.   In the case of *Smurr* v. *State*, 105 Ind., 133, (4 N. E. 450), it is said: "We have many cases declaring that where a party goes to trial without objection, before a judge assuming to act under color of authority, he cannot, after judgment or conviction, successfully make the objection that the judge had no authority to try a cause.   *Feaster* v. *Woodfill*, 23 Ind. 493; *Mitchell* v. *Smith*, 24 Ind. 252; *Watts* v. *State*, 33 Ind. 237 ; *Winterrowd* v. *Messick*, 37 Ind. 122; *Rose* v. *Allison*, 41 Ind. 276; *Kennedy* v. *State*, 53 Ind. 542; *State* v. *Murdock*, 86 Ind. 124; *Fassinow* v. *State*, 89 Ind. 235; *Huffman* v. *Cauble*, 86 Ind. 591; *Board* v. *Sealon*, 90 Ind. 158; *Kenney* v. *Phillipy*, 91 Ind. 511; *Myers* v. *State*, 92 Ind. 390, see page 396; *Wood* v. *Franklin*, 97 Ind. 117 ; *Rogers* v. *Beauchamp*, 102 Ind. 33, (1 N. E. 185)."   To these may be added *Greenwood* v. *State*, 116 Ind. 485, (19 N. E. 333); *Schlungger* v. *State*, 113 Ind. 295, (15 N. E. 269) ; Works, Court & Jur. §§ 28, 60, 61, p. 390.   Also it is said in same case, page 133, 105 Ind., and page 450, 4 N. E.:   "There is some confusion, and perhaps conflict, in the earlier cases; but the later cases, supported, as they are, by all well-considered cases in our Reports, must be regarded as firmly settling the rule that where a judge assumes to act under lawful authority, and there is color of authority, his acts will not be void, and that, if the party voluntarily goes to trial without objection, an objection after conviction will be too late to be of avail.   This is in harmony with the great weight of authority elsewhere.   *Bank* v. *McCall*, 4 Bin. 371 ; *State* v. *County Court of Boone Co.*, 50 Mo. 317; *Blackburn* v. *State*, 3 Head, 690; *Clark* v. *Com.*, 29 Pa. St. 129; *Com.* v. *Hawkes*, 123 Mass. 525 ; *Com.* v. *Tabor*, *Id.* 253 ; *Sheehan's Case*, 122 Mass. 445 ; *State* v. *Anone*, 2 Nott & McC. 27 ; *State* v. *Alling*, 12 Ohio, 16 ; *Masterson* v. *Matthews*, 60 Ala. 260 ; *Mayo* v. *Stoneum*, 2 Ala. 390 ; *State* v. *Carroll.* 38 Conn. 449."

This matter of waiver being binding on the prisoner, it is equally binding on the State. The prisoner, even in this Court, continues his waiver, and does not now and never has raised any objection to the manner of the selecting of the special judge. But on behalf of the State objection is taken to the election of a special judge, by reason of an enactment of the legislature of which it was impossible for the court to have any knowledge at the time and place where the judge was selected; and because the new formalities próvided by the new law were not carried out fully, without objection by the prisoner, the election is held to have been void, although the prisoner was in court, waiving all objection, and insisting on the legality of the judge's selection. This certainly makes him a *de facto* judge, if not *de jure*, and he could have been made *de jure* by putting the parties to their choice of signing and filing the writing provided in the latter part of section 11 of chapter 112 of the Code, as amended by chapter 49, Acts 1897, or, by reason of refusal to do so, of having the proceedings set aside.

It is insisted that, because the regular judge in attendance failed to make the necessary preliminary order directing the election of a special judge, the election held by the members of the bar and the selection made was void, and that, therefore, the appointee was no judge at all, and all his proceedings were invalid; in short, that unless he was a *de jure* judge he could not be such *de facto*. This reasoning does entirely away with the distinction between the terms "*de jure*" and "*de facto*." The legal definition of an officer *de facto* is "one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." *State* v. *Carroll*, 38 Conn. 449. In short, he is a person filling an office by a void appointment or selection thereto. In *Carleton* v. *People*, 10 Mich. 259, it is said: "All that is required when there is an office to make an officer *de facto* is that the individual claiming the office is in possession of it performing its duties, and claiming to be such officer under color of an election or appointment, as the case may be. It is not necessary that his election or appointment be valid, for that would make him an officer *de jure*. The official acts of such per-

sons are recognized as valid on grounds of public policy, for the protection of those having official business to transact." *Norton* v. *Shelby Co.*, 118 U. S. 425, (6 Sup. Ct. 1121). The effect of the provisions of chapter 49, Acts 1897, in requiring a preliminary order to be entered by the regular judge in attendance before a special judge can be elected, is to render invalid an election had without such order, but it does not and ·cannot do away with the doctrine of *de facto* officers. It simply changes an otherwise *de jure* officer into a *de facto* officer, to wit, one whose appointment or election is void, but whose official acts under color of such appointment or election are held valid on the grounds of public policy, especially against those who negatively submit or affirmatively waive all objection thereto. The acts of an illegally appointed special judge are not void, but only voidable, and, if objection thereto is not seasonably made, they will be deemed to have been waived. *Greenwood* v. *State*, 116 Ind. 485, (19 N. E. 333); *Lillie* v. *Trentman*, 130 Ind. 16, (29 N. E. 405). The rules upholding the acts of *de facto* officers as valid apply to special judges irregularly chosen or appointed. Works, Courts & Jur. 391. I am therefore of the opinion that the proceedings in this case should be set aside and reversed back to and including the order made and entered of record by the regular judge, Romeo H. Freer, Esq., on the 11th day of March, 1897, and the special judge, Thomas P. Jacobs, Esq., be directed to proceed with the case to a final judgment.  ·

ON REHEARING.

BRANNON, PRESIDENT:

A petition for rehearing for the first time makes the point that it does not appear that the indictment has the indorsement, "A true bill," The record does not show that the indictment had not such indorsement. It says that the grand jury "reported an indictment against Frank Cross for a felony, 'A true bill.'" This imports that it has such indorsement. The absence of a statement that there was such endorsement does not prove that there was not. It in effect says that there was. *Brotherton* v. *Peo-*

*ple*, 75 N. Y. 159; Whart. Cr. Pl. & Prac. § 369. But the record says the grand jury declared it "A true bill." That is enough. Judge Dade in the *Burgess Case*, 2 Va. Cas. 487; *White's Case*, 29 Grat. 824; *Price's Case*, 21 Grat. 846. There is nothing of any substance in the *quære* on this point in *State* v. *Heaton*, 23 W. Va., 773. If there were anything in the point, it comes too late after plea. *Burgess' Case, supra;* Whart. Cr. Pl. & Prac. § 369. A later certificate of the clerk shows there was such indorsement. There is nothing in the point that, at a term when a continuance was entered, the record does not show that prisoner was set to the bar. The order says the case was continued, and "thereupon" prisoner and others acknowledged a recognizance, thus showing he was present, and, moreover, it was a mere continuance not opposed. If it may be inferred from the record that the prisoner was present, that is enough, without formal statement of his presence. *Lawrence's Case*, 30 Grat. 845. No formal arraignment is necessary, as section 2, chapter 159, Code, abolished it.

*Affirmed.*