## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### ROGERS V. COMMONWEALTH.

March 16, 1922.

Absent, West, J.

1. WITNESSES—*Competency—Children—No Fixed Age—Discretion of Trial Court—Reversal on Appeal.*—There is no fixed age at which a child must have arrived in order to be competent as a witness. Of course, no one would think of calling a child two or three years of age as a witness in a case, but the whole question of competency must be left largely to the discretion of the trial court, and its judgment will not be reversed except for manifest error. He has the opportunity of seeing the child and its demeanor on the stand, which cannot be photographed in the record, and unless what is in the record clearly shows that he has committed error, his action will not be reversed.

2. WITNESSES—*Competency—Children.*—Though a child may be too young to be convicted of perjury, this is not decisive of its competency as a witness.

3. WITNESSES—*Competency—Children—General Rule.*—In order to be competent as a witness, the child must have sufficient mental capacity to observe the data about which it has testified and record it in mind, and thereafter understand questions put to it and be able to give intelligent answers. There must also be a sense of moral responsibility, at least to the extent of a consciousness of a duty to speak the truth.

4. WITNESSES—*Competency—Children—Child of Six.*—In the instant case, a child nearly six years of age showed upon her examination in chief and on her *voir dire* that she possessed more than average intelligence, and the same appeared from her answers upon cross-examination to questions which could not have been anticipated and upon which she could not have been coached.

   *Held:* That the trial judge made no mistake in holding that the child was of sufficient mental capacity to testify as a witness.

5. CRIMINAL .LAW—*New Trial—Conflicting Evidence—Evidence Sufficient to Sustain Conviction.*—Upon the trial of accused for assault upon a little girl, the little girl and her brother proved the assault and the identity of accused. The testimony of the little girl as to the injury was apparently corroborated

by the testimony of her mother and that of the doctor who attended her.

*Held:* That the evidence was sufficient to sustain a conviction, notwithstanding evidence as to the good character of the accused and as to an alibi.

6. APPEAL AND ERROR—*Weight to be Given to Finding of Lower Court.*—Upon a hearing before a judge without a jury, the finding of the judge upon the credibility of witnesses and the weight to be given to their testimony stands on the same footing as the verdict of a jury.

Error to a judgment of the Hustings Court of the city of Portsmouth.

*Affirmed.*

The opinion states the case.

*Venable, Miller, Pilcher & Parsons* and *J. C. Foster,* for the plaintiff in error.

*John R. Saunders, Attorney General; J. D. Hank, Jr., Assistant Attorney General,* and *Leon M. Bazile, Second Assistant Attorney General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The accused (plaintiff in error) was convicted of assault and battery upon a little girl, less than six years of age. The case was heard *de novo* in the Hustings Court of Portsmouth, on an appeal from the police justice, and, by consent of parties, a jury was waived and the case submitted to the judge of the court, who pronounced judgment against the accused and fixed his imprisonment at six months in jail. The chief witnesses for the Commonwealth were the little girl, who lacked two months of being six years old, and her brother, of the age of eight years. The assignments of error are (1) the incapacity of these two children to testify, and (2) that the judgment is contrary to the law and the evidence.

[1, 2] There is no fixed age at which a child must have arrived in order to be competent as a witness. Of course, no one would think of calling a child two or three years of age as a witness in a case, but the whole question of competency must be left largely to the discretion of the trial court, and its judgment will not be reversed except for manifest error. He has the opportunity of seeing the child and its demeanor on the stand, which cannot be photographed in the record, and unless what is in the record clearly shows that he has committed error, his action will not be reversed. The child may be too young to be convicted of perjury, but this is not decisive of its competency as a witness. *Commonwealth* v. *Robinson*, 165 Mass. 426, 43 N. E. 121.

[3] In order to be competent as a witness, the child must have sufficient mental capacity to observe the data about which it has testified and record it in mind, and thereafter understand questions put to it and be able to give intelligent answers. There must also be a sense of moral responsibility, at least to the extent of a consciousness of a duty to speak the truth. 1 Wigmore on Evidence, sec. 506.

In *Wheeler* v. *United States*, 159 U. S. 523, 16 Sup. Ct. 93, 40 L. Ed. 244, it is said: "While no one would think of calling as a witness an infant only two or three years old, there is no precise age which determines the question of competency. This depends on the capacity and intelligence of the child, his appreciation of the difference between truth and falsehood, as well as of his duty to tell the former. The decision of this question rests primarily with the trial judge, who sees the proposed witness, notices his manner, his apparent possession or lack of intelligence, and may resort to any examination which will tend to disclose his capacity and intelligence, as well as his understanding of the obligations of an oath. As many of these matters cannot be photographed into the record, the decision of the trial judge will not be disturbed

on review unless from that which is preserved it is clear that it was erroneous." It is further said in the same case: "Of course, care must be taken by the trial judge, especially where, as in this case, the question is one of life or death. On the other hand, to exclude from the witness stand one who shows himself capable of understanding the difference between truth and falsehood, and who does not appear to have been simply taught to tell a story, would sometimes result in staying the hand of justice."

In *Commonwealth* v. *Ramage,* 177 Mass. 349, 58 N. E. 1078, a child six years and four months old was received as a witness in a trial for an indecent assault upon her person, it being stated that the examination on the *voir dire* disclosed no unusual mental condition.

In *Trim* v. *State* (Miss.), 33 So. 718, a child five years of age was permitted to testify to the identity of a man who had killed her mother.

In *State* v. *Blythe,* 20 Utah 378, 58 Pac. 1108, a little girl about six years old was permitted to testify on a prosecution of a defendant for assault upon her with intent to commit rape, and it was said that the appellate court would not interfere with the holding of the lower court if the lower court, upon examination made upon its *voir dire,* or upon all of its testimony, concludes that the child is competent to testify, unless there is clear abuse of its discretion apparent from the record.

In *Uthermohlen* v. *Bogg's Run Co.,* 50 W. Va. 468, 40 S. E. 415-55, L. R. A. 911, 88 Am. St. Rep. 884, the trial court refused to hear the testimony of infants nine, ten and fourteen years of age, respectively, on account of lack of capacity, and the appellate court said, in affirming the ruling: "We cannot judge of the real character or degree of intelligence of these witnesses from their mere paper evidence. The judge of the circuit court had a means of decision in this matter not possessed by us, their pres-

ence face to face before him affording him a superior means to judge, of which we are deprived. In almost every case, that is the deciding test. In a great majority of cases the decision of the trial court in the matter of the competency of a child, depending as it does not on age, but on intelligence, must be final, and it must be a very flagrant case of error to authorize this court to reverse the judgment." Among other authorities cited are: *Peterson* v. *State,* 47 Ga. 524; Wharton on Ev., sec. 368; *State* v. *Edwards,* 79 N. C. 648; *State* v. *Manuel,* 64 N. C. 601; *State* v. *Michael,* 37 W. Va. 565, 16 S. E. 803, 19 L. R. A. 610.

The case at bar was decided by an able and experienced judge, who had before him not only the statements of the children on their *voir dire,* but also their testimony on the merits of the case. We need not go into the testimony of the boy, eight years of age, because he disclosed certainly as much intelligence and knowledge of the duty to tell the truth as his younger sister, and it is sufficient, therefore, to look to the testimony of the latter.

On the subject of the obligation of an oath, she testified that she was in regular attendance upon the Sunday school; that she did not know what it was to be a witness, or what was meant by the obligation of an oath. On this subject, however, she testified in part as follows:

"Q. Do you know what it means to tell the truth?

"A. Yes, sir.

"Q. What would happen to you if you did not tell the truth?

"A. Go to the bad man.

"Q. Go to the bad man?

"A. Yes, sir.

"Q. If you say anything here, are you going to tell the truth, or not, today?

"A. Yes, sir.

"Q. Everything you say will be true?

"A. Yes, sir.

\*      \*      \*      \*      \*      \*

"By the Court:

"Q. Do you know what the Bible is?

"A. Yes, sir.

"Q. What is it?

"A. It is learning to be good.

"Q. Whose book is it?

"A. The Lord's.

"Q. The Bible is the Lord's book, and it teaches you to be good?

"A. Yes, sir.

"Q. When you put your hand on the Bible, do you understand you are calling upon the Lord as bearing witness that you are telling what is true, and that you are not telling what is not true? Do you understand that?

"A. Yes, sir."

During the course of the examination of the witness on the merits of the case she stated that she did not hear what was asked her when she was sworn, and thereupon the court said that it would swear her over again. Then the following questions and answers ensued:

"Q. Your name is Mildred Cherry?

"A. Yes, sir.

"Q. This is the Bible, and when you put your hand on the Bible it means you are calling on the Lord to bear witness to the fact that you are telling the truth. Now, put your hand on the Bible. Will you, in answer to all the questions that are asked you in this case, tell the truth, the whole truth, and nothing but the truth, so help you God?

"A. Yes, sir.

"Q. All right. Now, in giving the answers to the questions that these gentlemen asked you and that these gentlemen who represent the defendant asked you, have you told the truth?

"A. Yes, sir.

"Q. You have told the truth?

"A. Yes, sir."

On cross-examination on this subject, the following questions were asked and answers given, while referring to something which the mother had said to the witness:

"Q. Did she tell you what to say when they asked you if you knew what it meant to tell the truth, and where you would go if you didn't?

"A. Yes, sir.

"Q. What did she say about that?

"A. She asked me did I know where I would go if I didn't tell the truth, and I said yes.

"Q. Did she tell you that they would ask you that this morning?

"A. She said they may and may not.

"Q. She said that they may and may not. Did she tell you if they did ask you that what you must say?

"A. Yes, sir.

"Q. What did she say you must say?

"A. That I would go to the bad man.

"Q. That is the reason you told the judge that, wasn't it?

"A. Yes, sir."

In view of the foregoing answers, we cannot say that the ruling of the trial court in permitting the witness to testify was plainly wrong.

[4] On the argument of this case it was insisted by counsel for the accused that the witness had been coached by her mother, and that she simply gave categorical answers to leading questions. There are many such questions and answers in the record, but an examination of the testimony of this little child discloses an amount of intelligence which seems to be quite above the average. She was asked over one hundred questions on her *voir dire* and examination in chief, and about one hundred questions on cross-examina-

tion. She was in the court room before strangers, and her intelligence is displayed by her answers. She was asked many questions on cross-examination which it could not have been anticipated she would be asked, and hence could not have been coached as to them.

.   There is much confusion in the record in the testimony of a number of witnesses, especially the adult witnesses, about dates in connection with the offense charged; but it is fairly plain that the alleged assault and battery must have taken place on the 19th of March, 1921. The testimony showed that the assault and battery occurred in a moving-picture show, in the city of Portsmouth, on Saturday night, March 19th. The little girl did not report it to her mother until the following day. On the following Saturday night the same two children were sent to the same moving-picture show for the purpose, if possible, of catching the party who had committed the assault on the evening of the 19th, and it was arranged that if the party came and renewed his advances, the little girl should notify her brother, and he should go out and get their father, who was working nearby, and bring him in so as to apprehend the guilty party. In order to show the character of the testimony of the little girl on this subject, we make the following extract from the record of questions asked her on cross-examination, and her answers thereto, on matters about which it seems to be fairly certain she could not have been coached:

"Q. After that first Saturday, when did you next see the man?

"A. It was the next Saturday night.

"Q. What time?

"A. Mamma sent me there the same time as I went the first Saturday.

"Q. Had you told your mother what this man did to you?

"A. Yes, sir.

"Q. And so you were going back to the pictures with your little brother?

"A. Yes, sir.

"Q. When you went in the theater that night—in the Palace that night—was this man sitting there again?

"A. No, sir; we went in and he came in after we did.

"Q. He came in after you did?

"A. Yes, sir.

"Q. Where did you sit the second night?

"A. The same place.

"Q. When the man came in, did he take a seat by you or by your little brother?

"A. By me.

"Q. How did he come and sit by you when you and your brother went—who went in the seats first, you or your brother?

"A. Who went to the seats?

"Q. Who went into the seat first when you and your brother got there the second night?

"A. Me.

"Q. You went in first and your brother came in next?

"A. Yes, sir.

"Q. Was he nearer the aisle than you?

"A. I came on the second seat and he was the first.

"Q. When the man came in, did he have to pass your brother and then by you?

"A. Yes, sir.

"Q. He passed by your brother and then by you and took his seat next to you?

"A. Yes, sir.

"Q. Did you say anything to him when he first came in?

"A. No, sir.

"Q. Why didn't you and your brother get up and leave when he came?

"A. Mamma wanted us to catch him.

"Q. Wanted you to catch him?

"A. Yes, sir.

"Q. Had you seen the man since the last Saturday night?

"A. No, sir.

"Q. You had not seen him at all?

"A. No, sir.

"Q. Well, how long did you stay in the movies the second Saturday night?

"A. No longer than we did the last Saturday night.

"Q. You stayed in there an hour?

"A. Yes, sir.

  *   *   *   *

"Q. Well, could your little brother hear what he said to you?

"A. No, sir.

"Q. Did you tell your little brother that he was troubling you again?

"A. He heard some of it, though, but he didn't hear it all.

"Q. Did you tell your little brother that it was the same man, and that he was troubling you?

"A. Yes, sir; and he knew it, too.

"Q. How do you know that he knew it?

"A. Because he seen him.

"Q. Well, why didn't you get up and leave when he commenced troubling you again?

"A. Mamma told me to stay there and wait until brother got daddy.

"Q. Stay there and wait until your brother got daddy. How long did little brother stay after this man started to fooling with you?

"A. It wasn't long before he went and called daddy."

We are satisfied from this testimony that the trial judge made no mistake in holding that the little girl was of sufficient mental capacity to testify as a witness.

We need not go into the same line of examination as to

the boy, for he certainly disclosed as much intelligence as his younger sister, and evoked from counsel for the accused during the examination the remark that "He is a pretty smart boy."

[5, 6] The remaining assignment of error is that the judgment of the court was contrary to the law and the evidence. After the Commonwealth had introduced its evidence and had proved the assault by the little girl, and the identity of the accused by both the little girl and her brother on the night of March 26th as the same man who had sat by her on the night of March 19th, the accused introduced a number of witnesses to prove his good character, and also several witnesses to prove an alibi on the night of the 19th. In addition to this, he testified himself, denying unqualifiedly that he was at the picture show on the 19th, or that he committed any assault at any time on the little girl. This testimony is directly in conflict with the testimony of the little girl, and also of her brother, as to his being at the theater on the night of the 19th. In addition to this, the testimony of the little girl as to the injury done her is apparently corroborated by the testimony of her mother and that of the doctor who attended her, as to the injury which she had sustained. It is true that the doctor testified that the injury might have come from some other cause, but there is no doubt about the existence of the injury, and there was no evidence before the trial judge of any other cause which might have produced it. The question was one to be decided by the trial judge, and his judgment upon the credibility of witnesses and the weight to be given to their testimony stands on the same footing as the verdict of a jury. *Martin* v. *Richmond, etc.,* 101 Va. 406, 44 S. E. 695; *Hoster* v. *Stag Hotel Corp.,* 111 Va. 223, 68 S. E. 50; *Carson* v. *Mott Iron Works,* 117 Va. 25, 84 S. E. 12; *Town of Appalachia* v. *Mainous,* 126 Va. 423, 101 S. E. 359.

Under these circumstances, the judgment of the trial court cannot be set aside for this cause.

Upon the whole case, we are of opinion that the judgment of the trial court must be affirmed.

*Affirmed.*