# Staunton

ROBERT O. CROSS v. COMMONWEALTH OF VIRGINIA.

September 10, 1953.

Record No. 4094.

Present, All the Justices.

The opinion states the case.

*Major M. Hillard* and *Broudy & Broudy*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *C. F. Hicks, Assistant Attorney General,* for the Commonwealth.

HUDGINS, C.J., delivered the opinion of the court.

This writ of error brings under review the second trial of Robert O. Cross, on an indictment charging him with raping Patricia Nelson, a six-year-old girl. This Court, on review of the first trial, reversed the judgment, set aside the verdict fixing defendant's punishment at life imprisonment, on the ground that the evidence was insufficient to sustain the conviction, and remanded the case for a new trial "if the Commonwealth be so advised." 192 Va. 249, 64 S. E. (2d) 727. The Commonwealth elected to pursue the prosecution, and put defendant upon a second trial that resulted in a judgment of conviction, with his punishment fixed at twenty years confinement in the State penitentiary.

On the first trial the judge held that inasmuch as his examination of Patricia Nelson disclosed that she did not know right from wrong, she was an incompetent witness. On the second trial, the same judge held her to be competent, and her testimony was admitted over the objection of the accused. This testimony is the only substantial additional evidence offered on the second trial. In view of this fact, the evidence will not be re-stated in this opinion, as it was fully and fairly stated in the former opinion, to which reference is hereby made.

After the case was remanded defendant filed a plea of former jeopardy, based on the judgment of this Court setting aside the first judgment of conviction. The court's ruling, rejecting this plea, is assigned as error.

There is no merit in this assignment. When an accused is convicted of an offense and applies for and obtains a new trial, he thereby waives his former jeopardy and subjects himself to further prosecution for the same offense. *Benton* v. *Com.,* 91 Va. 782, 21 S. E. 495; *Lane* v. *Com.,* 190 Va. 58, 55 S. E. (2d) 450; *State* v. *Cross,* 44 W. Va. 315, 29 S. E. 527.

██ Defendant's main contention is that inasmuch as the trial court, on April 27, 1950, held that Patricia Nelson was incompetent to testify concerning events which occurred on January 21, 1950, she was incompetent on April 25, 1952 (the date of the second trial), to testify concerning the same events.

The general rule, with which we are in accord, is that the competency or incompetency of a child must be determined as of the date the child is offered as a witness and not at the time the incidents testified to occurred. The fact that a child was held to be incompetent at the time of the first trial is not of itself an adjudication of its continued incompetency to testify concerning events that occurred prior to its becoming competent. *Maynard* v. *Keough*, 145 Minn. 26, 175 N. W. 891; *Kelly* v. *State*, 75 Ala. 21, 51 Am. Rep. 422; *Rueger* v. *Hawks*, 150 Neb. 834, 36 N. W. (2d) 236; *People* v. *Watrous*, 7 Cal. App. (2d) 7, 45 P. (2d) 380; *State* v. *Meyer*, 135 Iowa 507, 113 N. W. 322, 124 Am. St. Rep. 291; *Burnam* v. *Chicago G. W. Railroad Co.*, 340 Mo. 25, 100 S. W. (2d) 858; *Mitchell* v. *The State*, 103 Tex. Crim. Rep. 92, 279 S. W. 1112; 58 Am. Jur., Witnesses, sec. 129, pp. 97, 98.

There is no specific age at which a child must have arrived in order to be competent as a witness. A child is competent to testify if it possesses the capacity to observe events, to recollect and communicate them, and has the ability to understand questions and to frame and make intelligent answers, with a consciousness of the duty to speak the truth. Wigmore on Evidence, 3d ed., Infancy, sec. 506, p. 596; 5 Jones Commentaries on Evidence, 2d Ed., Competency of Witnesses, sec. 2106, p. 3953; 70 C. J., Witnesses, secs. 121, 122, pp. 91-94. The question of the competency of a child as a witness, to a great extent, rests in the sound discretion of the trial court, whose decision will not be disturbed unless the error is manifest. *Carpenter* v. *Com.*, 186 Va. 851, 44 S. E. (2d) 419; *Mullins* v. *Com.*, 174 Va. 472, 5 S. E. (2d) 499; *Rogers* v. *Com.*, 132 Va. 771, 111 S. E. 231; 20 Mich. Jur., Witnesses, sec. 9, p.

423; Wigmore on Evidence, 3d Ed., Infancy, sec. 507, p. 597.

The pertinent evidence introduced on the competency of Patricia Nelson and that tending to show that she had little, if any, recollection of her own concerning the alleged attack is quoted below.

Upon the first trial a part of her examination on her *voir dire*, in chambers, was:

"Q. And you say you are going to tell the truth about it today?

"A. Yes.

"Q. What do you mean by telling the truth?

"A. I don't know.

"Q. You don't know what that means?

"A. No.

"Q. Do you know what telling a falsehood means?

"A. No.

"Q. Do you know the difference between right and wrong?

"A. No."

Upon this testimony the trial court held that Patricia was not a competent witness.

On the second trial Patricia was again examined in chambers, and after answering numerous questions intelligently, stated that she knew the difference between right and wrong, but that it had been so long since the alleged assault that she did not remember much about it. Her cross-examination, in part, was as follows:

"Q. Have you talked to your mamma and daddy about this since the last trial?

"A. Yes, sir.

"Q. Have they talked the matter over with you? * * *

"A. Yes.

"Q. They have told you what to say here today, haven't they?

"A. No, sir. They just told me to tell the truth.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Did they tell you to say that you were going to tell the truth?

"A. Yes, sir.

\*     \*     \*     \*     \*     \*     \*

"Q. When have you talked to her [the mother] since that time?

"A. Last night.

\*     \*     \*     \*     \*     \*     \*

"Q. Last night you told the whole story over again?

"A. Yes, sir.

"Q. \* \* \* You told your mother last night what you told the Judge today?

"A. Yes, sir.

"Q. How many times have you told them that since two years ago?

"A. I don't know.

"Q. Every once in a while your mother would get you to tell it?

"A. Yes, sir.

"Q. About once a week?

"A. No, sir.

"Q. Many times?

"A. Yes, sir.

"Q. Lots of times you would tell the story over and over again?

"A. Yes, sir.

"Q. Some things you didn't remember and your mother would tell you?

"A. Yes, sir, she would read it out of a book.

"Q. When she read it out of a book you would recite it, you would tell it?

"A. Yes, sir.

"Q. When you couldn't think of anything your mother would read it out of a book and you would remember it, memorize it, would you?

"A. Yes, sir.

\*     \*     \*     \*     \*     \*     \*

"Q. Your mother told you Cross was the man who did it, that Robert was the man who did it, didn't she?

"A. Yes, sir.

"Q. Did she say to you, 'Did Robert bother you?'

"A. Yes, sir.

"Q. And you said no, didn't you? Did you say, 'No, Robert didn't bother me' or he did?

"A. He did bother me.

"Q. Didn't you tell your mother no the first time?

"A. Yes.

"Q. Why did you tell her no?

"A. Because I was scared she would whip me.

"Q. After you told her no she told you you could bleed to death unless you told her; is that right?

"A. What?

"Q. Didn't your mother threaten you that night to make you tell?

"A. She was threatening me?

"Q. And she told you you could die?

"A. Yes.

"Q. And you were frightened, scared to die?

"A. Yes, sir.

"Q. She said she knew Robert was the one that did it, didn't she?

"A. I knew it at first.

"Q. You knew it at first?

"A. She didn't know nothing about it.

"Q. She suggested that to you, didn't she. She told you Robert was the man and asked you if he was the man when she first talked to you?

"A. Yes.

"Q. For the past two years you have been repeating this story from time to time with your mother; is that right?

"A. Yes, sir."

The following cross-examination of Patricia Nelson took place in the presence of the jury:

"Q. You have, of course, talked to your mother about this from time to time?

"A. Yes, sir.

"Q. You have talked to her a lot of times?

"A. Yes, sir.

"Q. And she would help you as to what to say when you got in Court?

"A. No, sir.

"Q. Did you remember everything?

"A. Not much.

"Q. You didn't remember much?

"A. No.

"Q. How would your mother teach you what to say. Did she read anything to you. How would your mother teach you what to say? It has been over two years ago, hasn't it?

"A. Yes, sir.

"Q. And you don't remember too much about it?

"A. I know a lot about it.

"Q. Did your mother read anything from a book?

"A. Yes, sir.

"Q. What did she read to you from the book?

"A. (Pause)

"Q. Did she help you at all, help you to tell what was out of the book?

"A. Yes, sir.

"Q. She did that last night?

"A. Yes, sir.

"Q. And a lot of times before today, too, didn't she?

"A. Yes, sir, I talked to her the same night.

"Q. You practically memorized what you are saying today, you memorized it so as to be able to tell it straight, the last two years?

"A. Yes, sir.

"Q. For the last two years?

"A. Yes, sir."

A careful consideration of the entire testimony of Patricia Nelson leads to the conclusion that her testimony is a recital of what her mother had repeatedly told her to

say rather than her own independent recollection of what is alleged to have occurred on January 21, 1950.

This conclusion is strengthened by other evidence in the record. The Commonwealth proceeded on the theory that the crime was committed sometime between 2:30 and 4:30 p. m. During this entire time Patricia and Barbara Ann, her eight-year old sister, were playing either in the Nelson back yard, defendant's back yard, or on the concrete driveway leading from Roger Avenue to a garage on the back of E. C. Stang's lot, which was to the north of and adjacent to defendant's lot. The children were in and out of their home. During the interval Patricia Nelson was in sight of or in hearing distance of at least three people besides defendant—Barbara Ann, her mother, and E. C. Stang.

Stang testified that during this period (with the exception of about twenty minutes) he was sitting at a table in his dining room, near a large seven foot window through which he could see defendant's back yard; that he could not see the children while on his driveway because it was too close to the house for him to see through the window, but that he could hear them playing there. Between 3:00 and 3:20 p. m. he left his house to take his dog for a walk, and on the way back stopped and talked to defendant, who was in his own yard.

Barbara Ann did not know anything about the alleged assault upon Patricia. She testified that on the occasion in question she was playing with Patricia, and a part of the time, was "rolling" Terry, the two-year old son of defendant, "up and down" the Stang driveway.

Mrs. Nelson testified that at approximately 4:30 p. m. she went into her back yard, and not seeing the children therein, she returned to her home and telephoned defendant to know if they were in his house. On being informed that they were, she requested him to send them home, which he did immediately. The children came home, played with their toys in the house, ate supper, and between 7:30 and 8:00 p. m. went upstairs to take a bath and prepare for bed. It was approximately three and a half hours after the

children returned home before Mrs. Nelson's attention was called to the physical condition of Patricia. When she asked Patricia "Did Robert [meaning defendant] bother you today," she answered in the negative. The mother stated that it took her two to two and a half hours to obtain from Patricia sufficient information and details to satisfy her that defendant had committed an assault upon her. Her exact language is: "It took me from that time [7:30 or 8:00] until 10:00 o'clock to get all of the details and satisfy my own mind that we had the right person and that something definitely had happened. I just wanted to be sure and it took that length of time to draw all the information [from Patricia] I needed to believe such a thing had happened."

It will be noted that Patricia Nelson did not voluntarily connect defendant with the crime. It was only after a long, searching examination by, and on the suggestion of, her mother that she finally said defendant was the party who had made the assault upon her.

There is no evidence tending to show that Patricia screamed, cried or complained of any discomfort during the interval between 2:30 and 8:00 p. m. On the contrary, the evidence is that she appeared normal, continued to play in the yard, in defendant's house, went back and forth in her own home, played with her toys after 4:30, ate supper and said nothing about the alleged assault until she went upstairs to take a bath preparatory to going to bed. Had she screamed or cried she could have been heard, or observed, by her mother, Barbara Ann and Stang. While the children were playing outdoors, the mother was not more than 100 feet from defendant's garage and back yard. Her ·statement on this point is: "I was ironing in the living room and I· could see out through my back living room window, and from time to time I would look out there and I saw them playing in front of his garage, what would be the front of his garage, and they were raking in some leaves and brush there, and he had a fire and they were helping him clean up and playing around out there with the baby."

Her cross-examination, in part, is as follows:

"Q. During that period were you able to see where they [the children] were all the time?

"A. Not every minute, but I could see them from time to time, yes.

"Q. Occasionally you would see them?

"A. That is right.

"Q. As a matter of fact, they were not in Cross' yard the entire time as they came into your house at various times?

"A. That is right.

"Q. They went out back and forth maybe three or four times during the whole time; is that true?

"A. That is right.

"Q. When they came in they maybe stayed five or ten minutes and then would go back?

"A. Sometimes they would come in together and sometimes separately. As children play they don't always come in together or go out together.

"Q. You were not keeping your eyes on them every minute of the time, and you didn't know exactly where they were going around the house?

"A. I didn't go out and stay with them and watch every movement, no, but I knew where they were.

"Q. You knew by the fact that you would occasionally glance out and see them at various points?

"A. Yes."

When the competency of a child of tender years as a witness is challenged, its examination on its *voir dire* must show not only that the child knows the difference between right and wrong, but that it has sufficient mental capacity to receive reasonably accurate impressions of the facts to which its testimony relates and to relate truly the impressions received. The testimony in this case discloses that Patricia Nelson was not testifying from her independent knowledge of what occurred, or from the impressions she received, but was merely reciting the story that her mother had told her to tell.

This question was discussed in *People* v. *Delaney*, 52 Cal. App. 765, 199 P. 896, where it appeared that Delaney was charged with lewd and lascivious conduct involving a boy under ten years of age. The court, in declaring the boy to be incompetent to testify, said: "Meanwhile the boy undoubtedly had heard his parents talk about the case and its distressing facts. The force of suggestion, always strong, is particularly potent with the impressionable and plastic mind of childhood. We have no reason to believe that either parent consciously and willfully intended to influence the child's testimony. But without intending any such result, the repetition of supposed facts in the presence of a child often creates a mental impression or concept that has no objective reality in any actually existing fact. * * *

*    *    *    *    *    *    *

" * * * Lacking the ability accurately to recollect past occurrences, the child, though he may have received, at the time of their occurrence, just impressions of the facts respecting which he is called to testify, is not capable of 'relating them truly.'

*    *    *    *    *    *    *

"The second test prescribed by the statute must contemplate that a child's ability truly 'to relate' is to depend upon his *natural* power of narration, exercised through his unprompted relation of facts as to which he has previously acquired a 'just impression,' and not upon a factitious ability to recite what he may have heard, with frequent repetition, from others, whether their utterances were spoken with design or in complete innocence * * * ."

It is said in *Kuczon* v. *Tomkievicz*, 100 Conn. 560, 124 A. 226, that under the most liberal tests, the obligation of the oath and an intelligent comprehension of the facts sought to be developed remain a necessary part of the qualifications of a competent witness.

In *Hollaris* v. *Jankowski*, 315 Ill. App. 154, 42 N. E. (2d) 859, it was held that a child eight years of age was not a competent witness to testify to an accident which hap-

pened to him when he was between four and five years of age. The testimony showed that he was not a precocious child and that he had little, if any, independent recollection of the facts concerning the accident. The court said: " * * * Moreover, it affirmatively appears that he had been talked to so much about the accident by members of his family and lawyers that the child had little, if any, independent recollection of the facts and circumstances surrounding the accident. In any future trial he should not be allowed to testify * * * ."

The Commonwealth offered no evidence to contradict the testimony of Patricia Nelson to the effect that she had been consistently and repeatedly instructed by her mother as to the testimony she should give in court. Its contention is that the fact that Patricia had been coached did not make her incompetent or her testimony inadmissible, but that it was a mere circumstance to be considered by the jury in passing upon her credibility.

In support of this contention, the Commonwealth relies upon *Rogers* v. *Com.*, 132 Va. 771, 111 S. E. 231. The opinion in the *Rogers Case* does not disclose the extent of the coaching, but it does contain the greater part of the child's examination. This examination showed intelligent answers to many questions propounded. In holding that the child was a competent witness, the court said: " * * * an examination of the testimony of this little child discloses an amount of intelligence which seems to be quite above the average."

The facts in the case now under consideration are distinguishable from those in the *Rogers Case*. The examination of Patricia Nelson disclosed (1) that she was below the average in intelligence; she had failed one grade in school, but she did not remember the year when, or the grade which, she failed; (2) while she stated that she knew the difference between right and wrong, she had little, if any, independent recollection of the events which were alleged to have taken place on January 21, 1950; (3) ac-

cording to her own testimony, she told the story on the witness stand that her mother had made her memorize.

The opinion in the *Rogers Case* shows clearly that the child offered as a witness in that case met the test of competency stated in the following excerpt, quoted with approval, from *Wheeler* v. *United States*, 159 U. S. 523, 40 L. ed. 244, 16 S. Ct. 93: "Of course, care must be taken by the trial judge, especially where, as in this case, the question is one of life or death. On the other hand, to exclude from the witness stand one who shows himself capable of understanding the difference between truth and falsehood, and *who does not appear to have been simply taught to tell a story*, would sometimes result in staying the hand of justice." (Italics supplied)

While Patricia Nelson stated that she understood "the difference between truth and falsehood," she also stated that her testimony was the story that her mother had taught her to tell. It was not her independent recollection of the alleged attack upon her,—that is, she was incompetent as a witness because she did not have the capacity to recollect and communicate the impressions made upon her on January 21, 1950.

The admissibility of the testimony of any witness, adult or child, concerning the existence or nonexistence of certain events, with certain exceptions, depends upon whether such testimony is within the personal knowledge of the witness. The record discloses that the greater part, if not all, of the pertinent testimony of Patricia is within that class of testimony defined as hearsay in Black's Law Dictionary (De Luxe Edition), p. 882, as follows: "A term applied to that species of testimony given by a witness who relates, not what he knows personally, but what others have told him, or what he has heard said by others."

Since Patricia Nelson's testimony is the only direct evidence offered to prove that defendant was the criminal agent, and without which the evidence is insufficient to exclude every reasonable hypothesis of innocence, the judgment must be reversed.

The crime, as we characterized it in the former opinion, was "a dastardly one, calculated to excite abhorrence and resentment on the part of all right-minded people. Only a depraved person could commit such an act." However, the burden was upon the Commonwealth to establish, beyond all reasonable doubt, that defendant was the criminal agent. Since the Commonwealth has failed in two attempts to carry this burden, and it does not appear that it is in position to produce any additional evidence, we think the prosecution should be ended. We, therefore, set aside the verdict, reverse the judgment and remand the case with direction to the trial court to dismiss the prosecution.

*Reversed and remanded.*