# Richmond

CLARENCE HOWARD V. COMMONWEALTH OF VIRGINIA.

October 9, 1939.

Record No. 2177.

Present, All the Justices.

*A. L. Pitts, Jr.,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Joseph L. Kelly, Jr., Assistant Attorney-General,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

This writ of error brings under review the proceedings in the trial of Clarence Howard, who was charged with rape and sentenced to the electric chair. The only error

assigned is the refusal of the lower court to continue or post-pone the trial of the case.

The undisputed evidence for the Commonwealth establishes the following pertinent facts: Early in the morning of December 7, 1938, a strange negro came into a store operated by Mrs. Ellen Meadow in Farmville, Virginia. He told her that his name was Flood, and that his home was in Buckingham County. This negro then asked that credit be given him for a package of cigarettes, which was refused. He thereupon left the store. About twelve-thirty or one o'clock of the same day the negro returned to the store and took a seat by the stove. When the last customer then in the store left, the negro followed him to the front door. Within a few moments a Mr. Palmer tried to enter the store but found the door locked from the inside. The negro unlatched the door and remarked that the night latch must have slipped. When Palmer left, the negro again went to the front door. Mrs. Meadow was in the back of the room with her back toward the front when this negro grabbed her from behind. She attempted to catch the back door, but the negro grabbed her arm with such force that it was broken in three places. He then pulled out a knife and told her he would kill her if she made any noise. She was taken into the back room and raped. Thereafter the negro went from this room into the store. Mrs. Meadow called for help from the back window. Beverly Allen, an old negro who lived in the community, heard her and came to her assistance by breaking in a side door. As he entered this door he saw the strange negro going out the front door.

Mrs. Meadow at once notified the police and, either then or a few hours later while in the hospital, gave a general description of her assailant.

Police authorities concluded from this description and other information given them that the accused, Clarence Howard, was the perpetrator of the crime. He was indicted on January 17, 1938, and the next day was arrested in Williamson, West Virginia. When the learned and experienced trial judge was informed that the accused was

without means to employ counsel, he appointed Colonel A. L. Pitts, of the Buckingham bar, to represent the accused. Colonel Pitts was notified of his appointment on January 24, 1939, and at the time received the impression that the accused would plead guilty, hence he did not immediately consult the accused, who was then confined in the Henrico County jail. However, the accused stated to his attorney at their first conference that he was not guilty of the crime charged, and that he had never been in the town of Farmville. He also told Colonel Pitts that from November 15 until December 14 he was in Russell and Ashland, Kentucky, and gave him the names of several persons for whom he had worked during that period. Colonel Pitts wrote to these people on March 2, 1939.

On March 4, 1939, the trial judge, after consultation with the attorneys for the Commonwealth and the accused, called a special session of the circuit court of Prince Edward County to convene on March 21, 1939, for the specific purpose of trying the accused for the infamous crime, which had aroused much indigation in that section of the State.

Colonel Pitts received letters from the people in Kentucky, dated March 6, 7, 13 and 14, 1939, tending to establish the alibi as claimed by the accused. Colonel Pitts presented this information to the National Association for the Advancement of Colored People in Richmond and was told that the Association would raise the necessary funds to defray the expenses of the witnesses from Kentucky to Farmville, Virginia. On March 14, 1939, Colonel Pitts informed the trial judge and the Commonwealth attorney that he had received the information set forth in the letters and asked that the case be postponed or continued until he could take the depositions of the witnesses in Kentucky or arrange for their attendance. This motion was granted, and March 28, 1939 was fixed as the date of the trial. On March 20, 1939, the counsel for the accused served notice on the Commonwealth attorney that he would take the depositions of one of the witnesses—namely; Dr. William Burgess, of Russell, Kentucky—on March 25. The Com-

monwealth attorney agreed to go to Russell, Kentucky, and take the depositions of the witness, but reserved the right to object to the reading of the depositions at the trial.

The National Association for the Advancement of Colored People in Richmond changed its mind and declined to furnish any funds to obtain the evidence of the witnesses in Kentucky. Thereafter, Drs. Miller and Baker, two prominent colored physicians of Farmville, agreed to pay the expenses of these witnesses, but on March 23 they changed their minds and informed the trial judge and Colonel Pitts that they would have nothing further to do with the case. No further efforts were made to obtain the testimony of these witnesses—indeed, no other communication seems to have been had with the witnesses living in Kentucky.

It appears from the record that "on the morning of the 28th when the case of *Commonwealth* v. *Howard* was called for trial in the Circuit Court of Prince Edward County, counsel for the defendant made a motion for a continuance of the case for one more week in order that he might go to Kentucky and take the depositions of all of the witnesses. Counsel for the defendant offered to go to Kentucky and take these depositions at his own expense, but some question was raised as to whether or not the depositions could be read to a jury in a criminal case. However, counsel for the defendant filed the letters which he had received from the witnesses and which were the same letters which had been submitted to the court at the time of granting the first continuance in support of his motion for another brief continuance. Counsel for the defendant was compelled to make a motion because he did not know until the afternoon of the 23rd of March, 1939, that the Society for the Advancement of Colored People would not or could not put up the money to bring the witnesses here to Farmville.

"Counsel for the defense was not able on the morning of the 28th, when the second continuance was asked for, to show to the court that he would have been able to have gotten the witnesses here for the trial set for that day had

he received the money from the said Society, nor could he assure the court that he would be able to get the witnesses here for a trial if a further continuance were granted."

The general rule applicable to motions for a continuance is that such motions are addressed to the sound discretion of the trial court.

■ "It is well settled, by reason and authority, that the question of continuance rests in the sound discretion of the trial court, and this court will not reverse its judgment unless the ruling of the court was plainly erroneous. Counsel for the accused gave no assurance that the witnesses could be produced if the motion for a continuance were granted. * * *

■ ■ "The absence of a witness who has not been summoned where there is no assurance that his testimony could be had at another trial, if the case were continued, is not ground for a continuance. Likewise, the refusal to grant a continuance will not be considered an abuse of discretion where a witness is beyond the jurisdiction or compulsory process of the court, and there is no reasonable certainty of the party being able to produce such witnesses at the next term. *Hurd* v. *Com.*, 5 Leigh (32 Va.) 715; *C. & O. Ry. Co.* v. *Newton's Adm'r*, 117 Va. 260, 85 S. E. 461; *Matoaka Coal Corp.* v. *Clinch Valley Min. Corp.*, 121 Va. 522, 93 S. E. 799; *Town of Farmville* v. *Wells*, 127 Va. 528, 103 S. E. 596." *Wallen* v. *Com.*, 134 Va. 773, 777, 778, 114 S. E. 786, 788.

In *Tucker* v. *Com.*, 159 Va. 1038, 1040, 167 S. E. 253, we said: "Such motions are addressed to the sound discretion of the trial court, and only when the record shows that there has been abuse of this discretion will this court interfere with its ruling."

■ It was suggested in argument that the general rule applicable to motions for a continuance should not be applied as strictly to motions for a postponement of a trial to a later day in the same term. Perhaps the trial courts should consider the latter motion with more indulgence than a motion to postpone the trial to another term, but either

class of motions is addressed to the sound discretion of the trial court, whose ruling will not be reversed by this court unless the record clearly shows an abuse of such discretion. This has become the fixed and settled law in this jurisdiction.

In *Smith* v. *Com.*, 155 Va. 1111, 1119, 156 S. E. 577, 580, we said: "It is true that this exceptant is not within the rule which usually governs petitions for a continuance. He filed no affidavit. * * * . Our judgment does not depend upon its existence. We are of opinion that a man who is indicted and whose home is 300 miles from the point of trial and who sets up an *alibi* which must be proven by his neighbors, should be given more than twenty-four hours in which to produce his witnesses. We do not mean to indicate that he was entitled to a continuance. He was not entitled to one on this record, but he was entitled to have this hearing postponed, both for this reason and because counsel who was charged with the preparation of his defense was unavoidably absent."

There are sharp distinctions between the facts in the *Smith Case* and the one now under consideration. Counsel for the accused knew, prior to March 2, 1939, that the accused would "set up an alibi." He knew this on March 4 when, with his consent, the trial court fixed March 21 as the date for the trial. It is true that counsel was disappointed by the National Association for the Advancement of Colored People, but, after he knew that this Association would refuse his client financial aid, his motion for a postponement was granted. At the time this motion was made, he was under the impression that two private citizens would defray the expenses of the witnesses from Kentucky, but this offer of aid was withdrawn, to his knowledge on March 23, five days before the trial. While we realize that Colonel Pitts was without funds to defray the expenses of the witnesses and that he, at considerable expense to himself, visited the parties who had led him to believe that they would furnish money to assist in the defense of the accused, still, the record does not show that he attempted to com-

municate with the witnesses, either by letter, telephone or telegraph, after March 14, 1939.

The undisputed evidence in this case conclusively establishes that on or about November 29, 1938, there appeared in Farmville, Virginia, a strange negro who gave his name as "Clarence." He was given a bunk in a warehouse room occupied by several negroes and slept there every night until December 7, the date of the crime, when he disappeared from town. During most of this interval he was doing odd jobs for another negro, Woodson Washington, and taking meals at the latter's restaurant. An itinerant white painter from Reidsville, North Carolina, one Joe Perkins, was working temporarily in Farmville during the tobacco season, and was seen frequently, including the night of December 6, in Farmville with this "Clarence." Joe Perkins, after hearing about the crime, reported to the police authorities in Farmville that this strange negro had left town. Perkins stated that he knew the negro well, and had known him for more than twenty years. He gave the officers an accurate description of the accused, and stated that his full name was Clarence Howard. Presumably through this information the authorities obtained a photograph of the accused from Reidsville, North Carolina. This picture, with six or seven other photographs of negroes, was presented to Joe Perkins, to Woodson Washington—who had employed the missing man and eaten at the table with him three times a day for several days—to one of the negroes who had slept with him in the warehouse bunk room and who had seen him every day from November 29 to December 7, to Mrs. Meadow—the victim—and to other persons in Farmville. All of these people picked defendant's picture out of the group as the picture of the negro who had been seen in and around Farmville, in Mrs. Meadow's store. The identification of these eight witnesses was positive and certain that the accused was the "Clarence" who, as a stranger, had come to Farmville the latter part of November, 1938, and remained there until December 7, 1938.

The accused, while *en route* from Williamson, West Virginia, to Virginia, informed the officers who had him in charge that he was at different places from December 1 to December 5, 1938, but he could not remember where nor who was with him. He told them that on December 7 he was at Bartley, West Virginia, but could name no persons with whom he was associated in that place. From December 10 to 15 he claimed to have been at Berwind, West Virginia, with one Beatrice Stevens. Never once during the conversation with the officers did he mention Russell or Ashland, Kentucky, where he testified as a witness that he was on the day the crime was committed. When he was confronted with these statements on his cross-examination, he admitted that he misled the officers and, in explanation, stated that "he was going to wait and tell that (about living in Ashland and Russell) to his lawyer and to the judge." Every person, shown by the record to have come in contact with the strange negro who stated that his name was "Clarence" in Farmville, or who saw him in Mrs. Meadow's store before noon on December 7, positively identified the accused.

It is to be noted that most of the letters from Russell, Kentucky, which were written some three months after the period in question, were vague as to the exact time when the defendant had been seen there. Only one of these letters, the one signed "Jess White," with whom defendant is said to have lived from November 15 to December 14, is positive and specific as to dates. In the letter signed "J. F. Frazier," it is stated that the writer recalled seeing such a man in Kentucky and that he, through his wife, gave him a pair of shoes. As to the time when this occurred, the letter states "my wife tells me since I received your letter, that she remembers giving out the shoes, but cannot definitely fix the date, but to the best of her knowledge, it must have been about the middle of December, 1938."

Again, in another letter written by the same person, it is said. "He was comfortably clothed for the December

weather of the early part of the month, in which he spent several days in Russell." Also, "Mrs. Frazier (and others named by the writer) recalls distinctly giving Clarence Howard the shoes, and to the best of their knowledge, the time must have been possibly the third (3) or fourth (4) of December, 1938." The letter signed by Dr. Burgess states that "he came to my home some time the first week in December, 1938. Cant just state the exact day." The remaining two letters, one of which is from John Lewis, Chief of Police of Russell, Kentucky, state that defendant was in Russell "during November, 1938" or "in the late fall."

Even if the writers of these letters had been present at the trial and had given specific alibi evidence unshaken on cross examination, there still would have been before the jury the testimony of the eight disinterested witnesses—five of them members of the defendant's own race and three white men—positively identifying him. In addition, there would have been defendant's own admissions to the effect that when the arresting officers inquired as to his whereabouts during the first week in December, 1938, he mentioned several places but failed to mention Russell, Kentucky, for no better reason that that he "was going to wait and tell that to his lawyer and to the judge." From the record it appears that no one person who saw the negro "Clarence" in Farmville during the first week in December, 1938, entertained any doubt that the defendant was the same man.

■ But this was a revolting crime—one well calculated to arouse the indignation of all decent citizens. The public had a right to demand that swift apprehension and adequate punishment be awarded the culprit guilty of the dastardly offense. All reasonable steps leading to this end should have been promptly taken if the police authorities and the courts expect to continue to enjoy the full respect of citizens. But in attaining this end, it is to be remembered that an accused, whether guilty or innocent, must have ample opportunity to become fully acquainted with the

nature of the charge against him, and reasonable time in which to prepare his defense with the intelligent aid and advice of counsel. All these rights were extended this accused. The trial judge, with full knowledge of the nature of the crime and the indignation aroused thereby, upon apprehension of the accused, promptly appointed able counsel to represent him. He then gave counsel thirty-nine days, after informing him of his appointment, in which to prepare the defense of the accused before fixing the date of the trial, and then fixed the date on March 21, thereby giving the accused and his counsel seventeen additional days in which to prepare his defense. Later, when it was brought to the attention of the trial judge that there were or might be material witnesses for the defense in a foreign jurisdiction, and that counsel had been unable to obtain their presence at the trial because he had been disappointed by the National Association for the Advancement of Colored People, the trial was again postponed for another week in order for counsel and the accused to secure the benefit of the testimony of these witnesses. When the case was subsequently called for trial, neither the accused nor his attorney gave the court any reasonable assurance that the testimony of the absent witnesses would be available if the case were postponed to another date.

Upon the whole record we can not say that the trial court abused its discretion in refusing to again postpone the trial of this case. We therefore affirm its judgment.

*Affirmed.*

SPRATLEY, J., dissenting.

The evidence in the record of this case amply supports a verdict of guilt. But does the record contain all of the evidence which the accused might have offered if given full opportunity?

Howard is a penniless, friendless, uneducated negro. It was necessary for the trial court to appoint counsel to represent him. His counsel, although diligent and industrious, was unsuccessful in his effort to secure financial

aid necessary for making an investigation of the existence of certain evidence suggested by the accused, which evidence, if it existed, was of such a favorable nature to the accused as to justify consideration by the jury. While the production of this evidence could not be guaranteed, counsel gave every indication of his earnest desire to ascertain its existence and worth, with a promise to produce it if possible. A short postponement of the day of trial might have provided this opportunity or satisfied every one that it could not be produced. As it is, there remains at least a possibility that the accused has been deprived of presenting evidence in his favor and, so long as this possibility remains, there is a doubt that he has been afforded a fair opportunity to make his complete defense.

In criminal convictions, there should be no reasonable doubt of guilt, nor any reasonable doubt that the accused has had a fair opportunity to present all of the evidence in his favor. Here a death sentence has been imposed. The question before us could not have arisen if the trial had been delayed one or two weeks. If there was a mistake in identification, it could have been corrected in the lifetime of the accused; it will be too late to correct it after his death. It is better that justice be delayed rather than that its administration be buried with an attendance of doubt upon its fairness.

I am of opinion that the judgment of the trial court should be reversed, and the case remanded for a new trial, with an opportunity afforded the accused to present the evidence in question.

HOLT and BROWNING, JJ., concur in this dissent.