# Richmond

### ROBERT O. CROSS V. COMMONWEALTH OF VIRGINIA.

May 7, 1951.

Record No. 3794.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

The opinion states the case.

*Broudy & Broudy* and *Major M. Hillard,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Robert O. Cross, sometimes referred to herein as defendant, has been sentenced to life imprisonment upon his conviction by a jury of the rape of Patricia L. Nelson, a little girl six years old. He claims here, as he did below, that the evidence was not sufficient to support the verdict.

Patricia is the daughter of Mr. and Mrs. James Nelson. They have another daughter, Barbara, eight years old. The back yard of the Nelson home adjoins the back yard of the Cross home, in Fox Hall, Norfolk county. The Nelsons had lived in their home six years. Cross had lived in his some 20 years, first with his father and mother and after their deaths with his wife. He had been married four and a half years and had a son two years old. The Cross home faces on Rogers avenue, on the opposite side of which is the home of T. C. Anderson. On one side of the Cross home, separated from it by a driveway, is the

residence of E. C. Stang. On the other side, across a ten-foot alley, are tourist homes belonging to Brooks and Arnold. The Cross garage is in his back yard on the line between his property and the Nelson back yard.

Mrs. Nelson, the mother of Patricia, testified that on the afternoon of January 21, 1950, her husband left for his work about two o'clock and about two-thirty she let her two children, Patricia and Barbara, go out into her back yard to play. The defendant was then working in his back yard and his little boy was with him. The Nelson children went over and were helping him rake leaves and playing with the little boy. They came back into their own home two or three times for their dolls and to get water. A little before five Mrs. Nelson went out to call them but they did not answer and she did not see them in the yard. She went back into her house and called the Cross home on the telephone. Cross answered and she inquired whether Patricia and Barbara were there. He replied that they were; that they had just come in to put the little boy to bed for his nap. She told him to send them home and they came straight home.

Later she gave the children their supper and as she was starting their baths, between seven-thirty and eight o'clock, "Patricia said, 'Mamma, it feels like pins in my fanny', and I asked her what was wrong and she said she didn't know. I said, 'Did Robert bother you today?' and she said 'Nuh-uh,' " (meaning no, Mrs. Nelson said). Mrs. Nelson then said to the child that if anybody bothered her like that she would probably be bleeding to death before she could get her to a hospital. The child inquired, "Mamma, you mean if you bleed you die?" The mother replied, "Yes, before I found you you would if it is what I think." Patricia replied, "I did, Mamma."

Mrs. Nelson put her in the tub and Patricia "went back and told me all of the things that had happened." She related to the jury the child's description of what had occurred. She examined the child and found that she was "very open and red, but there was no bleeding, * * * but it looked like scratches, * * * her vagina and rectum both." When Mr. Nelson came home about eleven o'clock, Mrs. Nelson told him what had happened. They called doctors, who met them at the police station about midnight and she was later taken to a hospital for examination.

Dr. Reba Bliss testified that at the hospital she made a thorough examination and found that the child's vagina was

stretched and would admit four fingers. There were no lacerations but a great deal of redness and swelling, and there was a slight abrasion in the posterior portion of the rectum. She took smears from the vagina, high up near the cervix, examined them under a microscope and found spermatozoa.

The doctor testified that there was inflammation in the vagina. She was asked how long it took inflammation to set in, to which she replied, ''From a few hours, from four to six hours.'' She further testified that according to her reading it was possible to detect spermatozoa by microscopic examination within 72 hours after sexual relations.

The defendant was arrested at his home by two police officers around two o'clock next morning, January 22. They questioned him at headquarters and testified that he told them that Patricia had been over at his house the afternoon before and had then been in the garage and around in the yard and in the house. They said he denied guilt and stated that he was an educated, intelligent man and would not say he did anything like that. When arrested he asked the officers why they did not have him examined if they thought him guilty.

After Mrs. Nelson testified the Commonwealth called Patricia as a witness, but after preliminary examination she was not permitted to testify, as referred to later on.

Mrs. Cross, defendant's wife, testified that she left home that afternoon at approximately two-fifteen with her sister and the latter's husband to go downtown and without indicating to her husband the hour she would return. She came back about five o'clock, at which time her husband had just come into the house to see if the baby was still asleep.

Cross, the defendant, was 49 years old and was a statistician of the Seaboard Air Line Railway Company, for which company he had worked for 35 years. He had made and introduced in evidence a map showing the location of his home and the relative locations of the Nelson home and neighboring residences. Before that afternoon he had not seen the Nelson children since Christmas. He said that on the afternoon of the 21st they came over in his back yard where he was working and remained there for about half an hour playing with his little boy; that the two girls were together all the time and neither of them was in the garage; that they were in and about the yard but followed him into the house when he took the baby in to put him to bed and

left when their mother called and he carried the baby upstairs at approximately five minutes before three. A few minutes later he resumed his work in the yard. Mr. Stang, his neighbor, came by about three-fifteen and they talked. He also talked to Mr. Anderson, who lived across the street, three times during the afternoon and about four o'clock the latter brought his axe over to be sharpened. He said the Nelson children had gone before he talked to Stang or Anderson. He denied guilt and testified he had never been arrested or charged with any offense in his life involving moral turpitude. He said he might have told the officers he did not know whether anyone saw him that afternoon but stated he was doing the best he could under the circumstances to reply to their questions.

Stang testified that he was at a large window of his dining room at work on some problems of mathematics, facing and having a view of the defendant's back yard from one o'clock until about four-thirty, with the exception of about twenty minutes from about three to three-twenty. He did not see any children in the yard but heard children, sounding like three or four, playing on his driveway between his and the Cross property. Between three and three-twenty he took his dog for a walk and on his way back he stopped to talk to Cross. He did not see either of the Nelson children in the Cross yard at that time but after he went back into his house he heard several children playing on the driveway. About four-thirty or four forty-five he again saw Cross in his yard transplanting some small trees. The children were not there then. He also saw Anderson come along the driveway and go to the Cross garage about four o'clock. The children were not in the yard then and he did not see them after that.

Anderson, the neighbor across the street, testified he had been in public school work in Norfolk county and South Norfolk for many years, having served as principal of the Portlock high school and superintendent of schools in South Norfolk. He had known Cross for some twenty years. He saw him around noon that day and again at a time he thought must have been between four and four-thirty, almost sundown, when he took his axe over for Cross to sharpen. Cross was then cleaning up his yard and he did not see the Nelson children there at that time.

Stang, Anderson and eight other witnesses, neighbors and friends of the defendant, who had known him for periods rang-

ing from five to thirty years, testified to his good reputation, using phrases such as very good, excellent, very highest caliber, beyond reproach.

When Patricia was called to testify for the Commonwealth, counsel for defendant objected on the grounds of her age and lack of competence. The court overruled the motion on the ground of age and she was then examined in chambers as to her competence. See *Rogers* v. *Commonwealth,* 132 Va. 771, 111 S. E. 231; *Davis* v. *Commonwealth,* 161 Va. 1037, 171 S. E. 598; *Mullins* v. *Commonwealth,* 174 Va. 472, 5 S. E. (2d) 499; *Carpenter* v. *Commonwealth,* 186 Va. 851, 44 S. E. (2d) 419.

In response to questions she said, among other things, that she did not know what was meant by telling the truth or what a falsehood means or the difference between right and wrong. The court thereupon ruled that she was incompetent to testify and instructed the jury to disregard all of the details of the offense reported by the child to her mother, but that they should consider the child's report of the offense to her mother and by whom committed. At the conclusion of all the evidence the court again instructed the jury that everything Mrs. Nelson testified to in the nature of any details of the offense was stricken out and not to be considered; that it was proper for Mrs. Nelson to testify that a report was made to her of the offense and that it was stated to her who committed it, "but the name of the person who it was stated committed the offense should not be considered by you, and in the course of her testimony that name came out. That is also one of the details which is not to be considered." See generally *Howard* v. *Commonwealth,* 174 Va. 417, 4 S. E. (2d) 757; *Brogy* v. *Commonwealth,* 10 Gratt. (51 Va.) 722; *State* v. *Straight,* 102 W. Va. 361, 135 S. E. 163.

Stripped of the statements of the little girl to her mother, the case for the Commonwealth essentially was that on the afternoon in question Patricia was playing on or about the premises of the defendant from around two-thirty until about five o'clock, and was in the defendant's house for some period during that time. She came home in an apparently normal state but between seven-thirty and eight o'clock her mother discovered signs indicating she had been abused. In response to questions the child reported the occurrence. Examination by a doctor, made some time after midnight, disclosed evidence that a male person had had sexual relations with her. This evidence could have

been in existence as long as three days prior to the examination. The examination also showed inflammation which could be expected to begin from four to six hours after the injury to the membranes, but without definite evidence in this instance as to when it actually began.

During the afternoon, in the two and a half hours involved, Mrs. Nelson looked out and saw the children a time or two "and they came in the house after things three or four times." In that time children sounding like three or four were playing under Stang's window. When Stang stopped to talk to Cross about three-twenty he did not see either of the girls in the yard, but heard children playing in the driveway after that. No evidence was offered as to where or with whom Patricia had been prior to two-thirty that afternoon. Barbara, two years older than Patricia, was not offered as a witness by the Commonwealth although the defendant testified that Barbara was with Patricia all the time they were on his premises.

The crime was, of course, a dastardly one, calculated to excite abhorrence and resentment on the part of all right-minded people. Only a depraved person could commit such an act. It is sometimes difficult to give effect to the legal presumption of innocence in the trial of such a charge. The defendant opened the gates upon his record and no evidence was brought in to suggest any deviation from decency in the past.

The crime may, of course, like any other criminal charge, be proved by circumstantial evidence. As was said in *Dean* v. *Commonwealth*, 32 Gratt. (73 Va.) 912, 924, "Where all the circumstances of *time, place, motive, means, opportunity and conduct*, concur in pointing out the accused as the perpetrator of the crime, it must produce a moral, if not absolute, certainty of his guilt;" and it was added there that when these elements do all concur "the evidence is powerfully strengthened by the total absence of any trace or vestige of any other agent." 32 Gratt. (73 Va.) at p. 926. *Orange* v. *Commonwealth*, 191 Va. 423, 435, 61 S. E. (2d) 267, 272.

But the circumstances proved must be sufficient to exclude every reasonable hypothesis of innocence. They must do more than create suspicion. *Smith* v. *Commonwealth*, 185 Va. 800, 820, 40 S. E. (2d) 273, 282; *Garner* v. *Commonwealth*, 186 Va. 600, 614, 43 S. E. (2d) 911, 917; *Thomas* v. *Commonwealth*, 187 Va. 265, 271-2, 46 S. E. (2d) 388, 391.

Some of the elements of circumstantial evidence referred to in the *Dean Case,* while they exist with respect to this defendant, do not exist exclusively as to him, when only the admissible testimony is considered. Those particular elements would exist with respect to any other person in a situation like that occupied by this defendant. If the elements of time and opportunity were available to him, they were not necessarily available only to him. His previous conduct did not indicate guilt, nor was it substantially indicated by the evidence of his contemporaneous conduct.

On careful study of the evidence which was held to be admissible by the trial court, and which alone the jury had a right to consider, we conclude that it necessarily left a reasonable doubt of guilt and was therefore inadequate to support the verdict. We are strengthened in this conclusion by consideration of the fact that the jury, being human, would hardly be able to blot out of their minds and memories the revolting details of the offense related to them by the mother as having been told to her by the little girl, including the naming of this defendant as the guilty person. That possibility was recognized by the trial judge in ruling on the competence of the child as a witness.

The only other assignment of error is to the striking out of part of defendant's Instruction D-2 on the subject of reasonable doubt. The omitted part was adequately covered by defendant's Instruction D-1 and there was no error in this ruling.

Under all the circumstances of the case we think the judgment of conviction should be reversed and the case remanded for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*